Ruby Sears TIGRETT, Appellant,

v.

Gerald M. POINTER et al., Appellee.

No. 19601.

Court of Civil Appeals of Texas, Dallas.

Dec. 29, 1978.

Rehearing Denied March 8, 1979.

Alfred W. Ellis, Woodruff & Ellis, Dallas, for appellant.

Shannon Jones, Jr., Mitchell Baddour, Jr., Passman, Jones, Andrews, Coplin & Holley, Dallas, for appellee.

Before GUITTARD, C. J., and AKIN and ROBERTSON, JJ.

GUITTARD, Chief Justice.

In this garnishment proceeding the holder of a judgment against a corporation seeks to pierce the corporate veil and hold its sole stockholder, and also other corporations owned by him, personally liable for the judgment. Trial without a jury resulted in a judgment for the garnishees. On this appeal, plaintiff attacks the trial court's findings that the judgment debtor and the other corporations were not alter egos of the sole stockholder, asserting that she had proved alter ego conclusively as a matter of law, and, alternatively, that the court's findings are against the great weight and preponderance of the evidence. We hold that the alter ego theory was established as a matter of law and that the trial court's findings to the contrary are not supported by the evidence. Consequently, we reverse and remand with instructions to render judgment for plaintiff.

Plaintiff Ruby Tigrett sued Heritage Building Company in April 1974. The company was then insolvent according to the testimony of its president and sole stockholder, Gerald M. Pointer. On May 1, 1974, substantially all its assets were transferred to Pointer in consideration of a reduction of the company's indebtedness to him. On the same day, he transferred the same assets to Heritage Corporation. No money changed hands. The consideration was shown on the books of the transferee, Heritage Corporation, as a loan to it by Pointer in the same amount as the reduction of Pointer's loan to Heritage Building Company.

Plaintiff's lawsuit resulted in a judgment against Heritage Building Company on August 10, 1976, for $49 per week for 401 weeks,[1] but no assets remained on which execution could be levied. She brought the present suit in the form of an application for writ of garnishment, based on that judgment, against Gerald M. Pointer, Heritage Corporation, and other corporations owned and controlled by Pointer, alleging that the garnishees were indebted to Heritage Building Company as a result of the fraudulent transfer of its assets. She further alleged that Heritage Building Company, Heritage Corporation, and the other corporate garnishees were the alter egos of Pointer and that all of the garnishees were jointly and severally liable for the judgment.[2]

---

1. The nature of that action is shown in the opinion of the Court of Civil Appeals in *Tigrett v. Heritage Building Co.*, 533 S.W.2d 65 (Tex. Civ.App.—Texarkana 1976, writ ref'd n. r. e.).

2. No question is raised on this appeal concerning the propriety of raising the alter ego issue and asserting personal liability of Pointer and the other corporations in this garnishment action. Plaintiff's "First Amended Application

After rendering judgment for the garnishees, the judge filed findings of fact to the effect that neither Heritage Building Company nor Heritage Corporation was the alter ego of Pointer, that all of the corporate garnishees transacted business as separate corporate entities, that the corporate minute books were adequate, well maintained, and reflected the conduct of substantial business by the board of directors of each corporation, and that the transfer of assets by Heritage Building Company to Pointer was a legitimate payment of a legitimate indebtedness and was not a return of capital investment or equity. All of these findings are attacked on the ground that the opposite of each finding is conclusively established as a matter of law and on the alternate ground that each is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust.

### 1. Summary of Evidence

The relevant facts are not in dispute. The only testimony in the record is that of the appellee Pointer and his employees, and all the documentary evidence, other than plaintiff's judgment, was produced from the appellees' files.

Heritage Building Company was chartered in 1955 for the purpose of purchasing, subdividing and selling real estate, erecting and repairing buildings, and accumulating and lending money for these purposes. It was capitalized for $1,000 in cash, and 10,000 shares of stock were issued, of which 9,800 were issued to Gerald M. Pointer in consideration of $980. Pointer has since become sole stockholder, and he has always served as president and as chairman of the board of directors. The company acquired land and buildings, mostly apartment complexes, and also acted as general contractor for buildings erected on lands owned by Pointer. The corporate offices were maintained in a building owned by Pointer. Approximately six regular employees were paid by the corporation, including a bookkeeper and office manager, who also supervised the keeping of Pointer's personal books. Two of these employees acted as members of the board of directors, along with Pointer. Meetings were held routinely, loans and other corporate acts were authorized, and minutes were kept, but Pointer's proposals were always adopted without question.

The corporation's ledger contains a "loan account" showing its indebtedness to Pointer. On April 30, 1974, the ledger showed this indebtedness to be $484,218.00. No notes were signed, no security taken, and no interest paid. The only written evidence of the indebtedness in the present record is the notation in the corporate books. Pointer testified that he considered this a loan rather than a capital investment. The corporate financial statement, however, designates it as "capital."

On April 30, 1974, at a special meeting of the board of directors of Heritage Building Company, six days after service of process in plaintiff's suit, a resolution was adopted authorizing transfer of substantially all its assets to its president and sole stockholder, Gerald M. Pointer, in consideration of a reduction of the company's debt to him. On the next day entries were made on the books of the company, showing the transfer and listing in detail both real and personal property. Corresponding entries were made in Pointer's personal books showing his purchase of these assets. At the same time entries were made on the books of Heritage Corporation, also solely owned by Pointer, showing a transfer of the same assets from Pointer to it. No money changed hands. The books of Heritage Building Company showed a reduction of $389,967.00 in its debt to Pointer. This figure was determined by the book value of the assets, less the debts against them. The books of Heritage Corporation showed a loan of the same amount to it by Pointer. No deeds were signed until September 1975,

---

for Writ of Garnishment" alleges that the garnishees are personally liable jointly and severally for the judgment because the judgment debtor and each of the corporate garnishees are alter egos of Pointer. On this pleading, the issue of alter ego was joined in the trial court.

when Heritage Building Company conveyed the various tracts of land listed directly to Heritage Corporation. The transfer was not announced, even to the employees of Heritage Building Company, who first learned of it when they received their paychecks from the new corporation. Operation of the business continued without change. The same employees continued to perform the same duties in the same suite of offices. New stationery was printed, but "Heritage Building Company" remained on the office door and was still there at time of this trial.

The transfer of assets from Heritage Building Company to Pointer and from Pointer to Heritage Corporation on May 1, 1974, was explained by Pointer as a change of the corporate name and as an effort to improve the "credit reputation" of the business. He testified that the company had acquired a bad credit reputation and was unable to obtain loans because three of its apartment projects had been lost by foreclosure. In 1973, when the financial problems of Heritage Building Company became apparent, Heritage Corporation was organized with an initial capital of $1,000 and Pointer as the principal officer and sole stockholder. Its corporate purpose was somewhat broader than that of Heritage Building Company. The assets transferred consisted principally of real estate and equipment used in the construction business, all of which were listed in the books of Heritage Building Company as transferred to Pointer and in the books of Heritage Corporation as transferred to it by Pointer.

Pointer acknowledged that at the time of the transfer Heritage Building Company "owed a lot of other people," and that no provision was made for payment of other creditors. The corporation had no independent directors that were concerned about claims of creditors. Tom Fuller and Joseph Thompson, the employees who served as the other two directors at that time, testified that they were not concerned about the other debts of the corporation. Neither raised any questions in that respect. Their duties as directors had never been explained to them. They simply followed Pointer's instructions. They did not remember a meeting at which the resolution authorizing the transfer was approved, but they knew that Heritage Building Company was heavily indebted to Pointer, as were all of Pointer's corporations, and that the transfer would reduce that debt. Fuller testified that he knew that the transfer would strip the corporation of its assets, but Thompson said that he did not know it would have that effect and that the resolution was not explained to him.

The trial court made no finding as to whether Heritage Building Company was insolvent on May 1, 1974, when it transferred its assets to Pointer. No implied finding on that issue can be presumed because Pointer's testimony establishes as a matter of law that the company was insolvent and could not continue in business. He testified expressly that it was "insolvent," even before the transfer. This conclusion is supported by his factual testimony. Thus, he said that the transfer did not make the company insolvent because it was already insolvent and had "a large negative net worth." He said that the company "owed a lot of other people," but that no provision was made for payment of other creditors because "it had become obvious to us as directors that Heritage Building Company could not continue to function, so we had to shut the business down in effect." Pointer's testimony leaves no doubt that "virtually all" of the company's assets were transferred to him and then to the new corporation, and that after the transfer the new corporation carried on the business and the old company "did no business" and "had no assets." Besides its remaining debt to Pointer of $94,251, it still "owed not only me but a lot of other people a lot of money." Pointer testified further that in October, 1974 and several times in 1976 he put his individual assets and funds into the old corporation in order to pay some of its debts, including attorney's fees and court costs in the suit brought by plaintiff Ruby Tigrett. If the indebtedness to Pointer was a "legitimate debt," as the trial court found, then, unquestionably, even before

the transfer, the corporation was insolvent within the statutory definitions of insolvency as "inability of a corporation to pay its debts as they become due in the usual course of business." Tex.Bus.Corp.Act Ann. art. 1.02 (Vernon 1956).

The trial court found that Heritage Building Company had not ceased doing business at the time of the transfer of assets to Pointer. This finding is apparently based on evidence that the corporation was not dissolved, then or later, but continued to maintain its existence and pay its franchise taxes, that funds were deposited in its bank account, against which checks were written, that the company realized a profit of $91,000 in October 1974, and that in November 1974 the board of directors authorized the corporation to borrow $200,000 from Republic National Bank to purchase and develop certain land in Lancaster. Although these transactions may have been technically the acts of the old company, Pointer did not regard them in that light. He testified positively that the old company was "shut down" in May 1974 and "did no business" after that time. The new corporation, he said, took over all the employees and virtually all the assets, occupied the offices, and carried on the operations as if no transfer had occurred. Thereafter, he said, the old company had "no assets" and was "nothing but a bank account" in which for a time rents from his personal properties were deposited and on which checks were drawn for expenses, but that these were shown on the books as his personal funds and any profit or loss was attributed to him individually. Pointer explained, "Frankly, we had a lot of debt in there. We were rolling the debt by depositing these Heritage Apartment receipts in there."

He also explained that the "profit" of October 1974 came from two sources, an escrow fund of $25,000, which had been on the company's books all along and was then released because of satisfaction of the conditions, and $66,000 which was a profit on the sale of an apartment that he owned individually and which he contributed to the old company to pay some of its debts.

He testified also that the loan from Republic National Bank was actually a loan to the new corporation, but was closed in the name of the old company because that company had originally applied for it, although the new corporation received the money, acquired the property, and developed the land. Thus, although the evidence may be sufficient to support the court's finding that the old company had not ceased doing business at the time of the transfer, this finding cannot properly be understood as a finding that its business continued in its usual way.

### 2. Heritage Building Company as Alter Ego of Pointer

■ With these facts in mind, we turn to the authorities bearing on the alter ego question. It has been said that each case involving disregard of the corporate entity must rest on its own special facts. *Rosenthal v. Leaseway*, 544 S.W.2d 180, 182 (Tex. Civ.App.—Tyler 1976, no writ). When all the material facts are undisputed, however, application of the alter ego doctrine is a question of law. *American Petroleum Exchange, Inc. v. Lord*, 399 S.W.2d 213, 217 (Tex.Civ.App.—Fort Worth 1966, writ ref'd n. r. e.); *Pacific American Gasoline Co. v. Miller*, 76 S.W.2d 833, 851 (Tex.Civ.App.— Amarillo 1934, writ ref'd); *Continental Supply Co. v. Forrest E. Gilmore Co.*, 55 S.W.2d 622, 628 (Tex.Civ.App.—Amarillo 1932, writ dism'd); and *see Buie v. Chicago, R. I. & P. Ry. Co.*, 95 Tex. 51, 65 S.W. 27, 30 (1901).

■ Of course, domination of corporate affairs by the sole stockholder does not in itself justify imposition of personal liability. *Evans v. General Insurance Co.*, 390 S.W.2d 818, 822 (Tex.Civ.App.—Dallas 1965, no writ). Personal liability may be imposed on the sole stockholder only in extraordinary circumstances. Various statements of the circumstances justifying personal liability are found in judicial opinions, but common to all is the concept that the corporate form may be disregarded when it is used to perpetrate a fraud or is relied on to justify

wrong or injustice. *See Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 575 (Tex.1975); *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 351 (1955); *First Nat. Bank in Canyon v. Gamble*, 134 Tex. 112, 132 S.W.2d 100, 103 (1939); *State v. Swift & Co.*, 187 S.W.2d 127, 131–32 (Tex.Civ.App.—Austin 1945, writ ref'd); *Pacific American Gasoline Co. v. Miller*, 76 S.W.2d 833, 851 (Tex.Civ. App.—Amarillo 1934, writ ref'd); 1 I. Hildebrand, Texas Corporations § 5 (1942).

■ Accordingly, even though corporate formalities have been observed and separate accounts of corporate property kept, one who has dealt with the corporation may challenge the corporate entity by showing that he has been the victim of some basically unfair device by which the corporate form of business organization has been used to achieve an inequitable result. This principle is stated in *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336, 340 (Tex. 1968), as follows:

> [T]he corporate arrangement must be one which is likely to be employed in achieving an inequitable result by bringing into operation a basically unfair device which in all probability will result in prejudice to those dealing with one or more of the units making up the corporate arrangement, or one which has actually resulted in the complaining party's having been placed in a position of disadvantage by the exercise of inequitable means, of which the corporate arrangement is a part.

Among the unfair devices which have been considered in piercing the corporate veil is inadequate capitalization. One authority states that if a corporation carries on a business with so little capital that it is likely to have insufficient assets to pay its debts, it would be inequitable to allow the stockholders to set up such a flimsy organization to escape personal liability. W. Fletcher, Cyclopedia of the Law of Private Corporations, § 44.1 (rev. perm. ed. 1974). Another commentator has pointed out that the policy of the law supporting limited liability is to induce investors to risk their capital in the corporate enterprise, and that

to extend limited liability without requiring adequate capital would give the privilege without receiving the benefit of the investment and would have the contrary effect of encouraging entrepreneurs to subject as little of their capital as possible to the risks of the business. Drye, *Inadequate Capitalization as a Basis for Shareholder Liability*, 45 So.Cal.L.Rev. 823, 845 (1972).

■ Inadequate capitalization by itself may not be a sufficient ground to pierce the corporate veil. *Associates Development Corp. v. Air Control Products, Inc.*, 392 S.W.2d 542, 545 (Tex.Civ.App.—Austin 1965, writ ref'd n. r. e.). Thus, a party who has contracted with a financially weak corporation and is disappointed in obtaining satisfaction of his claim cannot look to the dominant stockholder or parent corporation in the absence of additional compelling facts. *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336, 340 (Tex.1968); *Hanson Southwest Corp. v. Dal-Mac Construction Co.*, 554 S.W.2d 712, 717 (Tex.Civ.App. —Dallas 1977, writ ref'd n. r. e.). Grossly inadequate capitalization, however, as measured by the nature and magnitude of the corporate undertaking, is an important factor in determining whether personal liability should be imposed. *Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 88 L.Ed. 793 (1944); *De Witt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685 (4th Cir. 1976); *National Marine Service, Inc. v. Thibodeaux*, 501 F.2d 940, 942 (5th Cir. 1974); *Holmes v. Clow*, 533 S.W.2d 99, 102 (Tex.Civ.App.—Tyler 1976, no writ); *Oriental Investment Co. v. Barclay*, 25 Tex.Civ.App. 543, 64 S.W. 80, 88 (1901, writ ref'd); *Automotriz del Golfo de California v. Resnick*, 47 Cal.2d 792, 306 P.2d 1, 63 A.L.R.2d 1042 (1957).

Appellees argue that in this case the minimum capitalization of $1,000 was more than adequate for the type of business carried on by Heritage Building Company, since construction projects on real property are generally financed by loans without personal liability, with the realty standing as collateral. This argument is conclusively

rebutted by the company's financial statement of April 30, 1974, which shows loans from Pointer to the company aggregating $484,218, designated as "capital." Although Pointer might have been able to carry on the business without advancing the money other than the amount he paid for the stock, he chose not to do so. Instead, he advanced money to the corporation from time to time in the form of loans aggregating more than four hundred times the initial capitalization. These loans were in addition to borrowings secured by liens on real estate and other property held by the company. There is no evidence that the company had ever obtained a loan from a financial institution without full security. It is most unlikely that a commercial lender or any other person without a shareholder's interest would have made such unsecured loans to a company with so little capital. Neither does it appear that Pointer's loans were made at times of financial stress, but rather pursuant to a practice Pointer had followed for many years of advancing funds needed in the company's operations. Pointer testified that he had loaned money to his corporations for years, and one of his employees, who served as a director of all the corporations, testified that all of Pointer's corporations were indebted to him. Thus, the evidence conclusively shows that the initial capital stock was grossly inadequate as compared to the funds which Pointer actually invested in the enterprise.

Another ground for disregarding the corporate entity is a dominant stockholder's preference of himself as a creditor, in violation of his fiduciary duty to an insolvent corporation. Appellees contend that a debtor, even though insolvent, may prefer one of several creditors by conveying property in satisfaction of the debt, citing *Hawes v. Central Texas Production Credit Association*, 503 S.W.2d 234, 235 (Tex.1973), and they insist that the evidence establishes that at the time of the transfer, Heritage Building Company was indebted to Pointer in an amount greater than the value of the assets transferred.

The rule that a debtor may prefer one of several creditors does not apply to an insolvent corporation when it can no longer continue to do business in the usual way. Its assets then become a trust fund for the benefit of all its creditors; consequently, its stockholders have no right, directly or indirectly through the managing officers, to pay or secure some of the creditors at the expense of others. *Lyons-Thomas Hardware Co. v. Perry Stove Mfg. Co.*, 86 Tex. 143, 24 S.W. 16, 23 (1893). In this situation, all the directors become trustees with the duty to see that the assets are devoted to the payment of corporate debts, without preferring one creditor over another. *Waggoner v. Herring-Showers Lumber Co.*, 120 Tex. 605, 40 S.W.2d 1, 5 (1931); *cf. Allied Chemical Corp. v. Randall*, 321 F.2d 320, 323 (7th Cir. 1963) (transfer of assets of insolvent corporation to affiliated corporation). More especially, because of this fiduciary duty, they are not permitted to manipulate the affairs of the corporation by preferring themselves as creditors to the injury of general creditors. *Continental Supply Co. v. Forrest E. Gilmore Co.*, 55 S.W.2d 622, 628 (Tex.Civ.App.—Amarillo 1932, writ dism'd). In equity, a large indebtedness in favor of a dominant stockholder may be treated as an advance of capital, and thus as subordinate to the claims of other creditors, if the corporation is capitalized for an inadequate amount. *Pepper v. Litton*, 308 U.S. 295, 309–312, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Duberstein v. Werner*, 256 F.Supp. 515, 521 (E.D.N.Y. 1966).

In *Pepper v. Litton, supra*, Litton, the dominant stockholder, attempted to defeat Pepper's claim as a corporate creditor by taking a judgment against the corporation, buying its assets at an execution sale, and then transferring them to a new corporation in exchange for stock. The Supreme Court held that regardless of whether or not Litton's judgment was based on a valid claim, he could not use his inside position to gain an unfair advantage for himself at the expense of other creditors. The opinion is

so pertinent to the present case that we quote from it at length in the margin.[3]

◼ Admittedly, most of the cases recognizing the fiduciary duty of the directors of an insolvent corporation are trust-fund cases, and, of course, the trust-fund doctrine and the alter ego doctrine have different consequences. The trust-fund doctrine allows a creditor to pursue corporate assets and hold the directors liable for that portion of the assets that would have been available to satisfy his debt if they had been distributed pro rata to all creditors, and it does not, in itself, justify piercing the corporate veil and imposition of unlimited liability on the stockholders. *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W.2d 624, 632 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ). On the other hand, we see no reason why the two doctrines should be mutually exclusive. The trust-fund doctrine, though urged by appellant, is not applicable here, and we do not rely on it as such, because it was not pleaded in the trial court and because appellant has not established her proportionate share of the assets. We cite the trust-fund cases only as establishing the existence of a fiduciary duty which Pointer breached at the time of the transfer. That breach may not in itself be sufficient to pierce the corporate veil and impose personal liability, as distinguished from the liability of a trustee. It adds weight, however, to the other circumstances shown and reveals those circumstances in a significant new light. When a corporation is completely dominated by a

---

**3.** *And so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder* not only in the foregoing types of situations but also *where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan.*

Though disallowance of such claims will be ordered where they are fictitious or a sham, *these cases do not turn on the existence or non-existence of the debt.* Rather they involve simply the question of order of payment. *At times equity has ordered disallowance or subordination by disregarding the corporate entity. That is to say, it has treated the debtor-corporation simply as a part of the stockholder's own enterprise, consistently with the course of conduct of the stockholder.* But in that situation as well as in the others to which we have referred, a sufficient consideration may be simply the violation of rules of fair play and good conscience by the claimant; a breach of the fiduciary standards of conduct which he owes the corporation, its stockholders and creditors. He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. *He cannot utilize his inside information and his strategic position for his own preferment.* He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. *He cannot use his power for*

his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.

On such a test the action of the District Court in disallowing or subordinating Litton's claim was clearly correct. Litton allowed his salary claims to lie dormant for years and sought to enforce them only when his debtor corporation was in financial difficulty. Then he used them so that the rights of another creditor were impaired. Litton as an insider utilized his strategic position for his own preferment to the damage of Pepper. *Litton as the dominant influence over Dixie Splint Coal Company used his power not to deal fairly with the creditors of that company but to manipulate its affairs in such a manner that when one of its creditors came to collect her just debt the bulk of the assets had disappeared into another Litton company.* Litton, though a fiduciary, was enabled by astute legal maneuvering to acquire most of the assets of the bankrupt not for cash or other consideration of value to creditors but for bookkeeping entries representing at best merely Litton's appraisal of the worth of Litton's services over the years.

This alone would be a sufficient basis for the exercise by the District Court of its equitable powers in disallowing the Litton claim. [Emphasis added].

single stockholder, who has advanced funds to the corporation from time to time in the form of unsecured loans amounting to almost five hundred times the amount of the original capital, and then, when other debts accumulate and the company can no longer continue its business in the usual way, he transfers all assets to himself in partial repayment of his advances so that he can continue the same business through another corporate vehicle without making provision for payment of other creditors, he may well incur the liability of a trustee, but the question arises also as to whether he is guilty of such unfair manipulation of the corporate enterprise in his individual interest that he can no longer be allowed to interpose the separate identity of the corporation to insulate himself from personal liability.

 Appellees argue that plaintiff has no standing as a creditor to complain of the transfer of assets by Heritage Building Company because her claim was unliquidated and had not been reduced to judgment when the transfer was made. We do not think that she must have reduced her claim to judgment at that time in order to assert Pointer's personal liability. She was at that time a claimant, and the subsequent judgment establishes the legitimacy of her claim and her standing as a creditor. *See Pierce v. United States*, 255 U.S. 398, 403, 41 S.Ct. 365, 65 L.Ed. 697 (1920); *World Broadcasting System, Inc. v. Bass*, 160 Tex. 261, 328 S.W.2d 863, 864–65 (1959). She need not show that the transfer was made with specific intent to defeat her claim in view of Pointer's unequivocal testimony that even before the transfer and without considering her claim, the company was insolvent, "owed a lot of other people," and could not continue in business, and that the assets were transferred to him without any provision for paying creditors. Her standing as one of several creditors is no worse than if she were the only creditor whose claim Pointer intended to defeat by putting the company's assets beyond her reach.

 Appellees also contend that the alter ego doctrine cannot be applied in the absence of fraud or bad faith. They cite *Holmes v. Clow*, 533 S.W.2d 99 (Tex.Civ. App.—Tyler 1976, no writ), which recognizes inadequate capitalization as a ground for piercing the corporate veil (*id.* at 101–102), but holds that an initial capitalization of $1,000 did not establish that the corporation was underfinanced to the extent that it constituted a fraud on persons dealing with it, since it also had a commitment from a bank for a loan in an amount which the incorporators believed sufficient to cover its debts. The court observed that subsequent failure of the corporation could not afford the basis of finding fraud at the inception. That case does not control here because in this case the claim of alter ego does not rest on fraudulent intent at the time of incorporation. This claim rests rather on the transfer of all the assets of the corporation to the dominant stockholder when the corporation was insolvent in violation of his duty to preserve the assets for the benefit of creditors. Whether he misled them or subjectively intended to defraud them is immaterial. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684 (4th Cir. 1976); *National Marine Service, Inc. v. Thibodeaux*, 501 F.2d 940, 942 (5th Cir. 1974); *Platt v. Billingsley*, 234 Cal.App.2d 577, 44 Cal.Rptr. 476, 479, 483 (1965); and *cf. Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 573 (Tex.1975) (plaintiff in tort case does not have burden of showing fraud to pierce the corporate veil). In the circumstances shown here, this action was so grossly unfair as to amount to constructive fraud, even though the corporation may not have been organized originally for a fraudulent purpose and even though no specific fraudulent intent is shown.

The situation is comparable to that in *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 584 (Tex.1963), in which the supreme court held that the breach of a fiduciary duty by directors in selling stock in competition with sales by the corporation was an act "which equity considers to be wilful and fraudulent, regardless of what may have been the actual motives . . . ." *Cf. Givens v. Girard Life Ins. Co.*, 480 S.W.2d 421, 425 (Tex.Civ.

App.—Dallas 1972, writ ref'd n. r. e.) (husband's excessive gift of community funds was constructive fraud without proof of specific intent to defraud). These decisions are in accordance with the principle stated by the supreme court in *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex.1964) as follows:

> Actual fraud usually involves dishonesty of purpose of intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests.

Here, the operation of the business on funds provided by unsecured loans from the sole stockholder, rather than on equity capital subscribed or contributed in the usual manner, created the false appearance of a corporation with substantial assets, although those assets were subject to withdrawal at will by the sole stockholder in satisfaction of the corporation's indebtedness to him. Significantly, Pointer's loan account is designated as "capital" in the company's financial statement on April 30, 1974, and although this listing is under "liabilities" rather than the more specific designation of "capital," which includes the capital stock, it emphasizes Pointer's practice of financing the corporate enterprise by advances of his personal funds and indicates recognition that the capital stock itself is grossly inadequate for this purpose.

Under these circumstances the insolvency, or prospective insolvency, of the corporation at the time of withdrawal of the assets is crucial in determining his right to do so to the detriment of other creditors. From Pointer's testimony as summarized above, we have no difficulty in determining as a matter of law that Heritage Building Company was insolvent and could not continue in business at the time of the transfer and thereafter. We recognize that a corporation may not be insolvent, though it has difficulty in paying its creditors and its balance sheet shows a temporary deficit. Nevertheless for the purpose of determining the existence of a fiduciary duty to preserve the assets for all the creditors, the test is whether the corporation's assets are insufficient for the payment of its debts and that it has ceased to do business, or has taken, or is in the act of taking, a step which will practically incapacitate it for conducting the corporate enterprise with a reasonable prospect of success. *Lyons-Thomas Hardware Co. v. Perry Stove Mfg. Co.*, 86 Tex. 143, 24 S.W. 16, 25 (1893); *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W.2d 624, 629 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ). This test is satisfied as a matter of law by the undisputed evidence in this case, whether or not the corporation was technically in a condition of "insolvency," as that term is defined by statute. Tex.Bus.Corp.Act Ann. art. 1.02 (Vernon 1956). Consequently, Pointer had a fiduciary duty that was breached when he transferred the company's assets to himself. Our question is whether that breach, in the light of the other circumstances shown here, requires imposition of personal liability without proof of the other requisites of the trust-fund doctrine.

We return, therefore, to the test set out in *Bell Oil & Gas Co. v. Allied Chemical Corp., supra*: a basically unfair device by which the fiction of separate corporate personality is likely to be or actually has been used to achieve an inequitable result. Such a device is clearly shown by the undisputed evidence in this case. Pointer organized Heritage Building Company with a minimum of capital stock and advanced the necessary working funds from time to time in the form of loans. When the corporation ran into financial difficulty, he used his dominant position as president, director, and sole stockholder to withdraw substantially all assets from the corporation without making any provision for payment of plaintiff and other creditors. Under the authorities above discussed, this maneuver was a violation of his fiduciary duty as officer and director of an insolvent corporation to preserve the assets for the benefit of all the creditors. It was particularly inequitable and unfair in that he preferred himself as a creditor, although in view of the

inadequate capitalization, his loan to the corporation must be treated as an advance of capital, or, at most, as a claim subordinate to those of other creditors. Although no one of these circumstances, standing alone, would justify piercing the corporate veil, when taken together, they demonstrate conclusively that while Pointer observed the form of the corporate enterprise, he ignored his substantive duties as a corporate officer and director and acted solely in his own interest. Consequently, we hold that the trial court erred in failing to hold him liable individually for the corporation's debts.

### 3. Heritage Corporation as an Alter Ego of Pointer

██ Plaintiff also attacks the trial court's finding that Heritage Corporation, the new entity to which the assets of Heritage Building Company were transferred, was not an alter ego of Gerald M. Pointer. We hold that this finding, likewise, is contrary to the undisputed evidence. The new company is equally Pointer's tool and equally subject to his absolute will. Admittedly, it was organized for the purpose of carrying on the same business as that of the Heritage Building Company after that company had run into financial difficulties. Before the transfer, the new company had no assets except, presumably, the $1,000 Pointer had paid for its capital stock. After the transfer it had substantially all the assets of the old company, with a net book value of $389,677, for which it had paid nothing but an entry in its books evidencing a loan in that amount from its president and sole stockholder. In practical operation the new company does not differ from the old. The only material difference is in the position of the creditors of the old company.

Appellees would have us hold that resolutions in corporate minutes and entries in corporate books are effective, like a magic wand, to free the enterprise from the claims of its creditors. We are asked to believe that the old company has been laid to rest, with neither the absolution of bankruptcy nor the obsequies of formal dissolution, and that a new corporation in its image has sprung up like a Phoenix, full-grown and free of fiscal infirmity. This legal legerdemain should deceive no one. Behind the corporate veil we see no miraculous new birth, but only a vain attempt by an entrepreneur to revive the same moribund enterprise without the transfusion of capital necessary to restore it to financial health.

We regard the entire transaction as a basically unfair device in which the new corporation as well as the old is a part. This device has, by inequitable means, put plaintiff and other creditors at a disadvantage and, in all probability, will result in similar prejudice to persons dealing with the business in the future. Consequently, we hold that the trial court erred in failing to disregard the corporate existence of Heritage Corporation as well as that of Heritage Building Company.

### 4. Other Corporations as Alter Egos of Pointer

██ The other corporations solely owned by Pointer present little difficulty. Pointer testified that East Realty Company, South Management Corporation, and Heritage Apartment Company have no assets or business of their own, but merely hold title to property that he owns individually. South Management Corporation has the same status, except that it holds nominal title to a piece of property owned jointly by Pointer and his partner, John Taylor, against whom several liens were outstanding.[4] All of these corporations have the

---

4. With respect to South Management Corporation, Pointer testified:

Q Are you the sole shareholder?
A Yes.
Q Is that again a thousand shares?
A Yes.
Q And you are the person that provided the capital for the formation of that corporation?
A Yes.
Q So South Management has title to a set of apartments at 2001 Fitzhugh; is that correct?
A Yes.
Q But once again as far as you are concerned, that property is yours personally along with Mr. Taylor—
A Yes.

same officers, directors, and stockholders as Heritage Building Company and Heritage Corporation, and none pay any salaries or dividends. The only one with any semblance of business activity is East Realty Company which, Pointer said, has a bank account in which he deposits rentals from apartments owned by him individually and on which checks are drawn for maintenance and repairs of these apartments. He has made loans to East Realty from time to time, and he transfers money from its bank account to himself whenever he wants it. The law will not permit a stockholder to treat all the assets standing in the name of a corporation as his individual property, which he can withdraw whenever he pleases, and also claim the benefits of a separate corporate entity. Clearly, all three of these corporations are but tools or conduits used by Pointer for his individual purposes rather than separate business enterprises. Consequently, we hold that they are also alter egos of Pointer. *Sundaco, Inc. v. State*, 463 S.W.2d 528, 532 (Tex.Civ.App.—Eastland 1970, writ ref'd n. r. e.); *McDonald & Co. v. Kemper*, 386 S.W.2d 215, 217 (Tex.Civ.App.—Fort Worth 1965, no writ); *Continental Supply Co. v. Forrest E. Gilmore Co.*, 55 S.W.2d 622 (Tex.Civ.App.—Amarillo 1932, writ dism'd). Actually, disregarding the separate existence of these corporations may have little practical significance because the assets standing in their names, or Pointer's interest in such assets, are subject to his individual debts anyway in view of his testimony that these assets are his individual property.

First North Corporation, however, stands on a different footing. Although Pointer was originally its sole stockholder, he contributed the stock to a family trust. The terms of this trust are not in evidence, and we do not know whether it is revocable or irrevocable. First North has assets of its own consisting of a vacant lot, a day-care center, and certain furniture and equipment located in apartments owned by Pointer, individually. Although Pointer evidently controls First North, there is no evidence that it has been used as a part of any unfair device that would put his assets or the assets of any of his other corporations beyond the reach of creditors. Consequently, we overrule plaintiff's points of error asserting that the trial court erred in failing to hold that it was another alter ego of Pointer.

### Judgment

Except with respect to First North Corporation, we sustain all of appellant's points attacking the findings of the trial court concerning the separate corporate existence of Heritage Building Company and the corporate appellees. We hold that these findings are contrary to the undisputed evidence and that plaintiff's allegations of alter ego are established as a matter of law. To the extent that any fact questions may be raised, we hold that these findings are against the great weight and preponderance of the evidence.

Accordingly, the judgment of the trial court is affirmed insofar as it denies relief against First North Corporation. Otherwise, the judgment is reversed and the cause is remanded with instructions to render judgment in favor of Ruby Tigrett against Gerald M. Pointer, Heritage Corporation, East Realty Company, South Management Corporation, and Heritage Apartment Company, jointly and severally, for all amounts due on the judgment of plaintiff Tigrett against Heritage Building Company, including interest as provided by law. All costs are taxed against appellee Gerald M. Pointer.

AKIN, J., dissenting.

Q Well, I guess I don't understand how the South Management Company can get the title but you say that you and Mr. Taylor own it. Could you explain that to me?
A It appeared for awhile that Mr. Taylor was going to go bankrupt, and he had a lot of liens outstanding against him, so rather than get my property or get the joint property involved, he and I agreed to conveying to South Management Company.
Q Okay.
A With the understanding that the ownership was the same.

AKIN, Justice, dissenting.

I cannot agree that the garnishor established as a matter of law that the Heritage Corporation, the Heritage Building Company and the other corporate garnishees were the alter egos of Gerald Pointer so as to make each jointly and severally liable for the garnishor's claim against the Heritage Building Company. Accordingly, I must dissent.

The majority opinion ignores both the legislative sanction of limited liability for corporate shareholders and extensive findings of fact made by the trial judge. To justify its alter ego result, the majority heavily relies upon a transfer of certain assets from Heritage Building Company to Pointer. The evidence fully supports, however, the trial judge's conclusion that this transfer was made in payment of a legitimate debt owed by Heritage Building Company to Pointer. The majority completely negates the legal existence of several corporations in order to satisfy a contingent, contractual, de minimus liability of Heritage Building Company—a liability that was not established by Tigrett until two years after the alleged improper transfer of assets. In my view, and in light of all authorities, this transfer does not, as a matter of law, justify ignoring these corporate entities, even if Heritage Building Company was insolvent at the time of the transfer. Accordingly, the judgment should be affirmed.

### Findings of the Trial Judge

The extensive findings of fact made by the trial judge, all of which are supported by evidence, should not be disregarded. This is crucial because it has long been held that each alter ego case will turn on its particular fact situation. Since all of the findings of the trial court are amply supported by evidence, this court is bound by those findings unless they are against the great weight of the evidence in which case

the proper judgment of this court would be to reverse and remand for a new trial rather than to reverse and render.[1] The majority has held, however, that there was no evidence to support the trial judge's findings and that the evidence conclusively establishes the contrary. With this, I cannot agree.

The trial court found that the transfer of assets by Heritage Building Company, the judgment-debtor, to Pointer was a valid and legitimate conveyance in payment of a legitimate corporate indebtedness and that the transfer was not made to avoid payment of any claim owed to any creditor, including the then unliquidated contract claim of Tigrett. The court further found that the Heritage Building Company, even after the transfer, was still legitimately indebted to Pointer for pre-existing debts in an amount in excess of $100,000 and that Tigrett's claim was de minimus. More importantly, it found that each of the corporations held formal directors' meetings and each maintained corporate minute books and records of these meetings, and each corporation maintained separate books, records, and bank accounts which were well-kept and more than adequate. The trial court also specifically found that the advancements both prior and subsequent to April 30, 1974, by Pointer to Heritage Building Company were for the benefit of Heritage Building Company, and that these advances were not investments of equity capital by Pointer in Heritage Building Company as plaintiff-garnishor had pleaded as her principal ground in support of her alter ego contention.

The majority has also mischaracterized the balance sheet of Heritage Building Company by stating that the loans from Pointer to the company aggregating $484,-218 are designated as "capital" on the balance sheet. The balance sheet of Heritage Building as of April 30, 1974, shows the following:

1. Although the majority does not here render judgment for plaintiff, but remands with in-structions for the trial judge so to do the result is the same.

Loans Payable—G. M. Pointer

| | | |
|---|---|---|
| G. M. P. Capital | $508,117.73 | |
| G. M. P. Apartment Operations—YTD | 23,899.49– | |
| Total Loans Pay— G. M. Pointer | | $484,218.24 |

Capital

| | | |
|---|---|---|
| H. B. C. Capital Stock | 1,000.00 | |
| H. B. C. Retained Earn— 5/31/73 | 74,780.44– | |
| (. . . accounts omitted) | (sums omitted) | |
| Total Capital | | $237,849.53– |

A reader of this balance sheet can clearly see that the sum of $484,218.24 in question is listed as a liability rather than as capital. Although the word "capital" is used in the entry "G. M. P. Capital," it is obviously not used in the sense implicit in the statement made in the majority opinion; instead, it is used in the sense of money. Since it was not listed under the capital section of the balance sheet but instead was listed under the liability section, it would mislead no one. This balance sheet comports with the undisputed testimony of Pointer and others that these were loans made by Pointer to the company, as found by the trial judge, rather than contributions of capital to that corporation as found by the majority. Indeed, the only evidence in this record was in accord with the trial court's finding on this particular point.

In addition to her alter ego plea, plaintiff asserted in her pleadings and in this court that a de facto merger took place between Heritage Building Company and the Heritage Corporation. This was also determined by the trial judge against Tigrett. In this respect, the trial court found that there was no acquisition of assets by Heritage Corporation from Heritage Building Company; instead, there was a transfer of some assets and liabilities by Heritage Building Company to Pointer in payment of a valid existing indebtedness and then a separate transfer of those assets and liabilities by Pointer to Heritage Corporation. Indeed, the assets acquired by Heritage Corporation from Pointer were only a part of the assets and liabilities transferred by Heritage Building Company to Pointer in repayment of Heritage Building Company's debt to Pointer. More significantly, the court found that after the conveyance of April 30, 1974, Heritage Building Company did not cease to do business and had not been liquidated or dissolved at the time of the trial of this cause in January of 1978. In October 1974, the Republic National Bank of Dallas loaned $200,000 to the Heritage Building Company. At least through the date of the trial, according to Pointer, the company maintained its own active bank accounts and its debt was rolled. This latter statement can be construed, as the trial judge apparently construed it, to mean that the company postponed the due dates of its indebtedness and thus was not legally insolvent since its debts never became due. Furthermore, in October of 1974, Heritage Building Company received income in excess of $92,000 and held title to substantial real estate holdings until late in 1976.

The $92,000 of income reported by Heritage Building Company in 1974, included $66,000 which was profit from the sale of an apartment complex. This apartment complex was one of the assets that had been transferred to Pointer on April 30, 1974, in part payment of the debt owed him by Heritage Building Company. When Pointer was asked why he voluntarily transferred this valuable asset back into Heritage Building Company, he replied that the company owed money and "I was trying to get money in there to pay those bills with." This evidence amply supports the trial court's finding that Heritage Building Company was not denuded [2] of assets by the transfer to Pointer on April 30, 1974, and was "at all pertinent times" a valid functioning corporation. Although the evidence does not show the net worth of Heritage Building Company after April 30, 1974, a valid functioning corporation may exist even with a negative net worth.

2. I recognize that a cause of action exists in Texas against directors and officers for denuding a corporation of its assets so as to defeat a creditor's claim. *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W.2d 624, 632 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ). Plaintiff has not, however, pleaded this ground.

Since there is a dearth of evidence in the record here, this is an especially improper case in which to apply the alter ego principle. The majority has, however, compensated for the lack of evidence by apparently shifting the burden of proof on the alter ego question from plaintiff to defendants in that the majority draws all inferences from the lack of proof in favor of plaintiff rather than in favor of the defendants. Thus, the majority has cast the burden of proof upon the defendant corporations to prove that they are not the alter egos of Pointer, rather than upon the plaintiff to prove that the corporations are the alter egos of Pointer. Indeed, the majority opinion may leave the reader with the erroneous impression that the alter ego doctrine is the rule rather than the exception to the rule that a corporate entity may not be disregarded.

Accordingly, in my view, the trial judge correctly concluded that the Heritage Building Company had not been used by Pointer or any other entity to perpetrate a fraud, to evade an existing legal obligation, to achieve or perpetrate a monopoly, to protect a claim, to justify a wrong, to circumvent a statute, or as a mere business conduit of Pointer or of another corporation. Moreover, the trial court correctly found that there was no intent on the part of Pointer or Heritage Building Company to defraud this plaintiff or any other creditor of Heritage Building Company when the conveyance of April 30, 1974, took place.

With respect to the evidence pertaining to the maintenance of separate financial books and records and the recordation and maintenance of minutes of directors and shareholders meetings, the majority concedes that the trial judge's finding that these records were adequately maintained is amply supported by the evidence. Thus, it is established as a matter of law that the separate corporate existence has been maintained. Consequently, the majority is apparently holding that all of these corporations are Pointer's alter egos because: (1) the resolutions that he recommended were passed, insofar as the witnesses could remember, thus showing his control of these corporations; (2) the capitalization of Herit-

age Building Company was apparently inadequate when it was capitalized in 1955, twenty-three years prior to this lawsuit; (3) Pointer used his corporate position to prefer himself as a creditor; and (4) Heritage Building repaid a legitimate debt to Pointer in 1974, at a time when the corporation was insolvent. Thus, the majority has not only substituted its findings for those of the trial judge, but has also misapplied the alter ego doctrine to its substituted findings. This I cannot accept since the majority's holding undermines the juridical concept of a corporation as a separate entity which should not be judicially ignored, except in the most extraordinary situations not present here. The alter ego exception to this general rule has never been utilized to impose liability on a shareholder because of a perfectly legal transaction.

Acting on these undisputed facts, the trial court properly held in its conclusions of law that since the transfer of assets by Heritage Building Company to Pointer was a legitimate payment of a corporate indebtedness which was not effected to avoid payment of any claim owed to any creditor, including plaintiff, and, since there was no fraud whatsoever involved, Heritage Building Company was not the alter ego of Pointer or of the Heritage Corporation. Although the trial court did not make specific findings with respect to the other corporations controlled by Pointer, such as East Realty Company, South Management Corporation, and Heritage Apartment Company, we must under Tex.R.Civ.P. 279 deem a similar finding of fact with respect to each corporation. *Lassiter v. Bliss*, 559 S.W.2d 353, 358 (Tex.1977). Indeed, as noted in footnote four of the majority opinion, the evidence shows that although the stock in South Management Corporation was in the name of Pointer, fifty percent (50%) of that stock was beneficially owned by one John Taylor and had been beneficially owned by Taylor since the inception of that corporation. Nevertheless, the majority has even chosen to ignore this fact in its result-oriented opinion.

### Alter Ego Exception

Under these undisputed facts, as a matter of law, the alter ego exception does not control; instead, the general rule applies. The general rule prohibits disregard of the corporate entity by a court unless that corporate entity is used as a means of committing fraud or to justify wrong in the sense of a violation of law or of public policy. *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 202 (Tex.1962); *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340 (1955); *First National Bank v. Gamble*, 134 Tex. 112, 132 S.W.2d 100, 103 (1939). Since the trial court found no fraud, and since the majority concedes that whether Pointer misled Tigrett or subjectively intended to defraud creditors is immaterial, the question then is whether these corporations were created and used in such a way as to violate public policy or to evade a statute or for another illegal purpose.

In support of its holding, the majority quotes the following from Justice Norvell in *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336, 340 (Tex.1968):

> [T]he corporate arrangement must be one which is likely to be employed in achieving an *inequitable result* by bringing into operation a basically unfair device which in all probability will result in prejudice to those dealing with one or more of the units making up the corporate arrangement, or one which has actually resulted in the complaining party's having been placed in a position of disadvantage by the exercise of inequitable means, *of which the corporate arrangement is a part.* [Emphasis added]

The majority seizes upon this language to buttress its holding that all of the corporations in question are alter egos of Pointer. In particular, the majority finds as the "inequitable result" the fact that Tigrett was not paid her contractual claim. Although it is inequitable, in a sense, that Tigrett's claim was not paid, this is not the type of "inequitable result" that justifies ignoring the corporate entity. The majority, however, couples this simple "injustice" in the sense of nonpayment of a contractual debt

of the Heritage Building Company with "inadequate capitalization" of the Heritage Building Company to arrive at its conclusion that these corporations are "unfair devices" and, consequently, should be ignored. This is not, however, the type of injustice or unfair device to which courts have applied the alter ego exception.

The majority's reliance on *Bell Oil & Gas* is misplaced because the supreme court held, in reversing the court of civil appeals, that the alter ego exception was inapplicable to the facts of that case, even though those facts were much stronger than the facts now before us. In *Bell Oil & Gas*, the supreme court noted that there was no evidence that the corporation, which entity the court of civil appeals had ignored, "was originally incorporated for an illegal, improper or fraudulent purpose." 431 S.W.2d at 340. Thus, it supports the view of Professor Hamilton in 19 Texas Practice: Business Organizations § 234 (1973) that we look at the corporation at the time of inception to determine whether it is a basically unfair device, and in so doing determine whether the corporation was created for an "improper or fraudulent purpose." Additionally, the supreme court in *Bell Oil & Gas* noted that the subsidiary was probably undercapitalized. 431 S.W.2d at 341. Furthermore, the supreme court stated that plaintiff's losses were due to an extension of credit to the subsidiary, which Bell controlled, rather than in reliance upon anything done by Bell. Thus, the supreme court refused to pierce the corporate veil of the subsidiary corporation and hold Bell liable because no fraud or detrimental reliance was shown. Similarly, no such detrimental reliance or fraud is present here. Instead, we are merely confronted with a contractual claim of Tigrett against Heritage Building Company. Indeed, the court of civil appeals in *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 420 S.W.2d 779, 787 (Tex. Civ.App.—Houston [1st Dist.] 1967), *rev'd*, 431 S.W.2d 336 (1968), had justified ignoring the corporate entity on the grounds of inadequate capitalization and the lack of corporate formalities, such as formal directors meetings. Here, of course, it is

undisputed that Heritage Building Company and the other corporations faithfully observed all corporate formalities. Consequently, I regard the supreme court's opinion in *Bell Oil & Gas* as supportive of this dissent rather than as authority for the majority's position. The quotation in the majority opinion from *Bell Oil & Gas* is merely obiter dictum, not intended to be applied to a situation where a simple injustice occurs.

As this court noted in *Hanson Southwest Corp. v. Dal-Mac Construction Co.*, 554 S.W.2d 712, 716–17 (Tex.Civ.App.—Dallas 1977, writ ref'd n. r. e.), "[t]he general rule is that courts will not disregard separate legal entities because of identity of ownership, directors and officers unless the *purpose* of the relationship is to defeat public convenience, protect fraud, defend crime, or justify wrongs, such as violation of antitrust laws" [Emphasis added]. *State v. Swift & Co.*, 187 S.W.2d 127, 131–32 (Tex. Civ.App.—Austin 1945, writ ref'd). Although we have here an identity of ownership of all of the corporations save one, the *purpose* for the existence of these corporations was not shown to be within the ambit of any of the public policy prohibitions which trigger the application of the exception to the general rule. The trial court found and the evidence clearly establishes that each corporation in our case was incorporated and maintained for a legitimate business reason, which the supreme court in *Bell Oil & Gas* found to be decisive.

The question of when to apply the alter ego exception to the general rule has been much confused by metaphors used by courts in describing situations where the exception applies. As Justice Cardozo noted in *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 155 N.E. 58, 61 (1926): "Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." This, in my view, is exactly what the majority has done. They focus upon such metaphors as "injustice" and to "prevent wrongs" to support their conclusion rather than looking to the essential terms to be defined which are the act of operation of the corporation and the purpose of the corporation. If the purpose of

the corporation is legitimate and if the activity of the corporation is such that no public policy is violated, then the general rule should apply. In other words, the alter ego doctrine should be applicable in only the most extraordinary situations, not present here. This principle and the reason for it was also delineated by Justice Cardozo in *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 155 N.E. 58, 61 (1926), where he stated:

"The logical consistency of a juridical conception will indeed be sacrificed at times, *when the sacrifice is essential to the end that some accepted public policy may be defended or upheld.* This is so, for illustration, though agency in any proper sense is lacking, *where the attempted separation between parent and subsidiary will work a fraud upon the law*" [Emphasis added].

*See* W. Fletcher, Cyclopedia of the Law of Private Corporations § 45 (rev. perm. ed., 1974). No such situation exists here since neither a fraud upon the law was attempted nor was there an accepted public policy to be defended. Instead, we have before us a simple unpaid contractual claim.

### The Nature of Tigrett's Claim

The majority refers to the fact that the name of Heritage Building Company remained on the door of the offices of these corporations and that the financial statement of Heritage Building Company on April 30, 1974, showed a negative net worth. The only significance that the sign on the door or the financial statement of Heritage Building Company could possibly have would be if these facts misled Tigrett to her detriment. The evidence shows, however, that this was not the case. Indeed, the claim of Tigrett, as well as the facts surrounding that claim, set forth in the opinion of the court of civil appeals in *Tigrett v. Heritage Building Co.*, 533 S.W. 2d 65, 67 (Tex.Civ.App.—Texarkana 1976, writ ref'd n. r. e.), shows that facts mentioned by the majority are immaterial. In that case, the court noted that Tigrett was an employee of Heritage Building Company and the basis of her recovery was an oral contract between Heritage Building

Company and Tigrett to pay her the same benefits as provided by workmen's compensation insurance. She sued on this oral contract which a jury found in her favor. 533 S.W.2d at 69. There was no question but that Tigrett knew she worked for Heritage Building Company and that she had contracted with Heritage Building Company. Since she knew the entity with which she contracted and was in no way misled, and since she has been apparently unsuccessful in collecting on that judgment from Heritage Building Company,[3] she is in poor position to assert the alter ego doctrine at this late date to collect the judgment from Pointer and the other corporate garnishees.

The very reasonable question presented here is whether a claimant who contracted with the corporation and then is disappointed should be permitted recovery from the sole shareholder and all other corporations in which that shareholder has at least a fifty-percent stock ownership. No case has ever extended the alter ego exception to such a situation. Indeed, courts have been more reluctant to ignore the rule of limited liability for shareholders in contract cases than they have in tort cases. *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d at 339; *Hanson Southwest Corp. v. Dal-Mac Construction Co.*, 554 S.W.2d at 717. The reason for less stringent standards in tort cases is grounded upon the fact that in contract the aggrieved party selects the party with whom he contracts; in tort, no such selection is available. *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 573 (Tex.1975). Thus, the more stringent requirements for applying the exception must exist here than in a tort case before the corporate entity may be ignored. These requirements, of course, have not been met.

*Grounds Asserted by Majority*

A. *Control by Sole Shareholder*

The first ground asserted in the majority opinion for ignoring the corporate entities is that Pointer, as the sole shareholder, controlled all of these corporations. It has long been established that shareholder liability will not result even where there is but one shareholder. *Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216 (1942) (per Alexander, C. J.); *Hake v. Dilworth*, 96 S.W.2d 121, 124 (Tex.Civ.App.—Waco 1936, no writ) (per Alexander, J.). As Chief Justice Alexander stated in *Hake*:

> "A corporation is a legal entity entirely distinct from its members, and, in the absence of fraud or other misconduct sufficient to invoke the doctrine of estoppel, its stockholders are not liable for the debts of the corporation. And the fact that all of the stock belongs to one stockholder does not alter the rule *so long as the corporate existence is maintained.*" 96 S.W.2d at 124 [Emphasis added].

Since, as the majority concedes, no question exists with respect to the maintenance of separate corporate records, and, since the majority also concedes that there is no actual fraud or intent to deceive, the question then becomes whether sufficient misconduct exists so as to invoke the doctrine of estoppel. Because there was admittedly no evidence of reliance by Tigrett on the financial soundness of the Heritage Building Company, estoppel cannot be asserted by her.

With respect to Heritage Corporation, East Realty Company, South Management Corporation, and Heritage Apartment Company, the only apparent ground in the majority's opinion for ignoring each corporate entity is that they were all controlled by Pointer, had little business activity, and had the same directors. As we have noted, *supra*, control and identity of directors are not grounds to pierce the corporate veil. Nevertheless, the majority has waived its magic wand and these corporations have evaporated. As to Heritage Corporation, the majority also adds the additional criteria that it received certain assets and liabilities from Pointer that he had in turn received from Heritage Building Company in

---

**3.** There has been no showing that Tigrett did not have an adequate remedy at law such as execution against property in the name of Heritage Building Company or a garnishment action against the bank in which Heritage Building's funds were kept. This point has not been raised.

payment of its debt to him. Thus, the majority erroneously concludes ipso facto that Heritage Corporation is a "basically unfair device" because the transaction was "a basically unfair device." Furthermore, the majority then finds, without evidence and contrary to the trial judge's finding, that it "will result in similar prejudice to persons dealing with the business in the future." I cannot accept this novel and extraordinary holding and no authorities support such a conclusion. The majority cites no authority for its holding and, indeed, none exists.

Neither do I regard *Pepper v. Litton,* 308 U.S. 295, 309–12, 60 S.Ct. 238, 84 L.Ed. 281 (1939), relied upon by the majority, as germane to the present case. In that bankruptcy case, the question presented was the order of payment in bankruptcy; no question of piercing the corporate veil was presented and, even had it been, *Pepper v. Litton* is distinguishable on its facts. The dominant shareholder in *Pepper* had permitted his salary claims to lie dormant for many years and then enforced them by obtaining a state court judgment against the corporation when the debtor corporation was in financial distress. He then used this so that the rights of another creditor were impaired. The Supreme Court noted that Litton acquired most of the assets of the bankrupt not for cash or other consideration of value to creditors, but merely for an appraisal by him of his salary over several years which he then set up on the corporation's books as a liability of the corporation. Thus, it appears that the retroactive salary appraisal was not shown on the bankrupt's financial statement upon which unsecured creditors relied. Additionally, there was a specific finding by the trial judge that this act amounted to fraud. In our case it is undisputed that Pointer did not defraud anyone nor did he intend to defraud anyone. Additionally, actual monies were transferred to the corporation by Pointer. Consequently, I do not regard the quotations from *Pepper v. Litton* in the majority opinion as applicable to the facts in our case. Essentially, different considerations apply in a priority of claims question

in bankruptcy where fraud is involved as opposed to an attempt to pierce a corporate veil to obtain payment of a claim where no fraud is shown.

B. *Undercapitalization of Heritage Building*

The majority next relies upon the assertion that the corporation was inadequately capitalized and, therefore, an "unfair device." The majority does not, however, specify at what point in time in the life of a corporation a court should look at a corporation's capitalization to determine whether it is an "unfair device." Is it at the time of inception of the corporation or at any point in time that a plaintiff or a court may choose? If it is the latter, then shareholders to avoid personal liability would have a corresponding duty to add additional capital so as to cover all existing liabilities and, under the majority's view, even contingent liabilities. Although the majority does not discuss whether the question of "inadequate capitalization" is to be determined at the time of incorporation in 1955 or at the time the transfer to Pointer took place in 1974, this question should be viewed at the time of incorporation rather than at a later date. 19 R. Hamilton, Texas Practice: Business Organizations § 234 (1973). This is not only sound but logical since Heritage Building Company may have been adequately capitalized in 1955 but inadequately capitalized in 1974, depending upon its successes or failures within that period. As the California Court of Appeals observed in *Harris v. Curtis,* 8 Cal.App.3d 837, 841, 87 Cal.Rptr. 614, 617 (1970):

> There is no question that the corporation was underfinanced, a condition not uncommon among new small businesses, including small corporations privately financed. It is common knowledge that many such corporations have been highly successful, that others have prospered but without legendary success, and that still others have failed in part, at least, because of inadequate capital. Such is the story of our American enterprise system.

This court, noting that no case had ever so held, specifically concluded that inadequate capitalization, per se, was insufficient to pierce the corporate veil.

In my view, the question of inadequate capitalization may be considered by a court in determining whether to pierce the corporate veil only where undercapitalization is a part of a general scheme to defeat the public convenience, protect fraud, defend crime, or circumvent public policy, such as violations of antitrust laws, none of which are present here. Indeed, there is no evidence here that the incipient capitalization of $1,000 in 1955 was inadequate then for whatever business that the Heritage Building Company may have conducted nor is there evidence that it was a basically unfair device. It does appear, however, that Heritage Building Company was successful during its first fifteen years of existence since it had obtained many large loans from major financial institutions in the conduct of its business. Thus, it seems absurd to me for the majority to rely upon "inadequate capitalization" in 1955 as a ground to pierce the corporate veil in 1978. As Professor Hamilton noted in 19 Texas Practice: Business Organizations § 234 at 228 (1974), "a corporation that was adequately capitalized when formed but has suffered losses is not undercapitalized." If Tigrett had chosen to use this as a ground for piercing the corporate veil, she should have, at least, presented evidence on this ground. Nevertheless, the majority has found that Heritage Building Company was grossly undercapitalized because Pointer made periodic loans to that company. This conclusion not only usurps the trial judge's function as fact-finder but also is logically unwarranted from a practical viewpoint since these loans were shown as such on financial statements submitted by Heritage Building Company before receiving loans from various commercial lending institutions. Certainly, no Texas court, nor any other, has measured the adequacy of corporate capital by examining the amount of subsequent indebtedness incurred by that corporation years after the initial incorporation date.

## C. *Payment of Debt to Pointer*

The primary ground asserted by the majority to pierce the corporate veil of Heritage Building Company appears to be that the judgment-debtor, Heritage Building Company, partially repaid its debt to Pointer when it was insolvent without first paying other creditors, such as the unliquidated contract claim of Tigrett. This ground lacks merit in both fact and law. In the first place, insolvency was not pleaded nor presented to the trial court in the sense of alter ego and no finding on this point was made by the trial court. Indeed, the trial judge found that Heritage Building continued in existence through the date of trial. Secondly, even if it was insolvent, as a matter of law, the supreme court has long held that a conveyance of property by an insolvent debtor to an unsecured creditor in payment of a debt is valid notwithstanding Tex.Bus. & Com.Code Ann. art. 24.02 (Vernon 1968), if the value of the property so conveyed "does not exceed the amount of the debt and the grantee creditor receives the conveyance in good faith, meaning without a secret agreement to benefit the grantor in some way other than by discharge of his debt." *Hawes v. Central Texas Production Credit Ass'n,* 503 S.W.2d 234, 235–36 (Tex.1973) (per Greenhill, C. J.); *Adams v. Williams,* 112 Tex. 469, 248 S.W. 673, 676 (1923); *Ellis v. Valentine & Son,* 65 Tex. 532, 546–48 (1886); *Edrington v. Rogers,* 15 Tex. 188 (1855). In *Adams v. Williams,* 248 S.W. at 676, that court stated:

It is settled law in this state that a creditor may receive payment of an honest debt in property of his debtor, though he may know at the time that the debtor's intent in making the payment is to prefer him and to place the property beyond the reach of other creditors, provided that no more property is taken than is reasonably necessary to pay his debt. Every payment of a debt by an insolvent, whether the payment be made in money or property, tends in a popular sense to hinder, delay, or defraud other creditors in the collection of their respective debts. In the absence of a law declaring prefer-

ences invalid, every debtor has the legal right to pay one or more of his just debts with any money or property he has. The intent to hinder, delay, or defraud creditors in the sense inhibited by above statutes cannot exist when the purpose and effect of the transfer of property is to apply it at its fair value to the satisfaction of a just debt and it is so received by the debtor.

Here, the evidence supports the trial judge's finding that Heritage Building Company transferred assets to Pointer in cancellation of an existing indebtedness to Pointer. Under the long standing rule in Texas, whether Heritage Building was insolvent at that time is immaterial in determining whether the payment was wrongful. Since, as a matter of law, Heritage Building Company had the right to transfer the assets to Pointer on April 30, 1974, I see no justification for using such a legal right as a ground for not only disregarding the corporate entity of Heritage Building Company but also of all of the other named corporations in which Pointer had an interest.

### D. Inconsistencies in the Majority Opinion

Preparation of this dissent has been more difficult than usual because the inconsistencies in the majority opinion have obscured their specific reasons for ignoring these corporate entities. For example, at one place the majority states that it does not rely upon the trust fund doctrine because it was not pleaded; yet in another section, they state that "this claim rests rather on the transfer of all the assets of the corporation to the dominant stockholder when the corporation was insolvent in violation of his duty to preserve the assets for the benefit of creditors." This quoted statement, of course, is the trust fund doctrine. At yet another place, the majority concedes that Tigrett failed to introduce sufficient proof to apply the trust fund doctrine. Thus, it is unclear to me whether the majority is relying upon the trust fund doctrine to disregard these corporate entities. In any event, the majority's position is not supported by authorities holding that facts establishing the trust fund doctrine may be used as

grounds to pierce the corporate veil of Heritage Building, much less that of the other corporations not involved in this transaction.

### E. Trust Fund Doctrine

If, as I suspect, the majority relies upon the trust fund doctrine as the primary ground for piercing the corporate veil, they err. This theory was neither pleaded by the plaintiff-garnishor nor presented to the trial judge. Secondly, it is impermissible to use this separate and distinct doctrine to support an alter ego theory of recovery. *See Fagan v. La Gloria Oil & Gas Co.,* 494 S.W.2d 624 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ); L. Lebowitz, *Recent Developments in Texas Corporation Law,* 28 S.W.L.J. 641, 757–61 (1974).

The disparate remedies provided by the trust fund doctrine and the alter ego theory mandate that the former should not be used as a crutch in applying the latter. Under the trust fund doctrine, creditors may seek a pro rata recovery of the corporation's assets, but under the alter ego theory, corporate assets are totally irrelevant and liability is imposed on the person or entity that attempts to assert the defense of limited liability granted by the corporate fiction. *Wortham v. Lachman-Rose Co.,* 440 S.W.2d 351 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ). The trust fund doctrine can be summarized as follows:

> [W]hen a corporation (1) becomes insolvent and (2) ceases doing business, then the assets of the corporation become a trust fund for the benefit, primarily, of its creditors. The officers and directors hold the corporate assets in trust for the corporate creditors. They are placed in a fiduciary relation to and owe a fiduciary duty to the creditors. That duty obliges them to administer the corporate assets for the benefit of the creditors and to ratably distribute them. The breach of that duty gives rise to a cause of action against the officers and directors which can be prosecuted directly by the creditors.

*Fagan v. La Gloria Oil & Gas Co.,* 494 S.W.2d 624, 628 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ). The purpose behind the trust fund doctrine, according to another court, is "to prevent fraud upon creditors through removal of corporate assets that creditors had reasonably believed to be in the corporation." *Whisenhunt v. Park Lane Corp.,* 418 F.Supp. 1096, 1098 (N.D.Tex.1976). In my view, whether the trust fund doctrine is applicable to a set of facts is separate and apart from the question of whether the corporate entity should be ignored and liability imposed upon stockholders.

Furthermore, from the above definition, before the trust fund doctrine can be applied, there must be a finding that the corporation is insolvent. *See* 3 I Hildebrand, Texas Corporations § 932 at 480 (1942). According to the Tex.Bus.Corp. Act Ann. art. 1.02(a)(16) (1956), insolvency is defined in terms of the corporation's inability to pay its debts as they become due in the usual course of its business. Although there was testimony that the Heritage Building Company was having trouble paying its debts, the trial court made no express finding that the company was insolvent at the time of the transfer in May 1974. Indeed, since Pointer testified that he put money into Heritage Building Company in order to pay its debts, there is some evidence that the corporation was not insolvent. The trial court did find, however, that Heritage Building Company had not ceased doing business in May 1974, and there is ample evidence in the record to support such a finding, which evidence has been set forth, *supra.*

Even more extraordinary is the utilization of the trust fund doctrine by the majority to impose personal liability on a shareholder under the alter ego doctrine. As noted earlier, the trust fund doctrine and the alter ego theory are conceptually different, each with its own remedy, and the two legal theories should be kept distinct. Additionally, it is illogical to permit plaintiff-garnishor a full recovery of her claim under the alter ego theory and rely on the trust fund doctrine to reach such a result. This is true because even if the trust fund doctrine applies, then other creditors have a pro rata interest in the assets allegedly misappropriated by Pointer from Heritage Building Company, and a full recovery by plaintiff will prevent these other creditors from receiving their pro rata share.

Another major problem, of course, in relying on the trust fund doctrine here is the plaintiff's status at the time of the transfer of assets in May 1974. At that time, she was asserting a *de minimus* unliquidated claim against Heritage Building Company when, as the majority apparently finds, the directors of the company allegedly breached their fiduciary duty to her. Courts have generally limited the trust fund doctrine to situations where creditors with liquidated claims are harmed by the improper transfer of assets from the business entity. Accordingly, I doubt the efficacy of its application to the facts here, even if plaintiff had chosen to assert it.

## CONCLUSION

From a policy perspective, the majority opinion may create more abuses and injustices then it stifles. For example, carefully framed statutes in the Texas Business Corporation Act may be rendered meaningless at the whim of a panacean court. Additionally, the rights of other unknown creditors of these corporations may be impaired, if not lost entirely, by the decision of the majority. Indeed, such a decision is detrimental to the entire statutory and juridical concept of a corporation as a separate entity and creates uncertainty for small, closely held corporations, by casting doubt upon their validity to such an extent that creditors would not likely extend credit. This is particularly true here since garnishor's unliquidated claim was first asserted in 1974 and finally reduced to judgment in 1976. Then, based upon another unrelated transaction in 1974, the corporate entity is ignored in 1978. Furthermore, the validity of all closely held corporations would be called into question many years after their birth at the caprice of a panacean court. Thus, the far-reaching effect of the majority's

erroneous holding will so adversely affect all such small, closely-held corporations that they may become as obscure as the dodo bird. Doubt will be cast where none existed before. The effect will be that the alter ego exception will devour the general rule that a corporation is a legal entity entirely distinct from its members, and, even if all of the stock belongs to one shareholder, in absence of fraud or other misconduct sufficient to invoke the doctrine of estoppel, the stockholders are not liable for the debts of the corporation, *if its separate corporate existence is maintained. Hake v. Dilworth,* 96 S.W.2d 121, 124 (Tex.Civ.App.—Waco 1936, writ dism'd); *see Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 351 (1955). In conclusion, I believe that courts must be ever mindful of novel extensions of the law because as Justice Cardozo pointed out, "[t]he sentence of today will make the right and wrong of tomorrow." B. Cardozo, The Nature of the Judicial Process, 21 (1921).

### ON MOTION FOR REHEARING

GUITTARD, Chief Justice.

Three points raised in appellees' motion for rehearing deserve additional comment. All are overruled except the one concerning corporations other than Heritage Building Company and Heritage Corporation. Insofar as the judgment concerns those corporations, the motion is granted.

#### Inadequate Capitalization

Appellees contend that we erred in considering capitalization of Heritage Building Company at the time its assets were transferred to Pointer rather than at the time it was originally incorporated. They argue that a corporation that had adequate capital to begin business cannot be considered undercapitalized merely because it suffers losses, and, therefore, its inability to pay its debts does not establish inadequacy of capital.

■ Our opinion should not be understood as holding that a stockholder is liable for a corporate debt merely because the corporation has insufficient funds. Neither

should it be taken as holding that personal liability is necessarily imposed on a stockholder who makes advances of personal funds to a financially weak corporation. We hold, rather, that when a corporation transfers virtually all its assets to its controlling stockholder to repay his advances, without providing for other creditors, the court may consider the amount of the capital stock as compared with the funds that the stockholder has actually invested in the enterprise as one of the factors in determining whether his manipulation of the corporate form of business organization to serve his individual interests justifies imposition of personal liability. Consideration of inadequacy of capital in the context of later developments is supported by the following authorities: *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 686 (4th Cir. 1976); *Luckenbach S. S. Co. v. W. R. Grace & Co.,* 267 F. 676, 681 (4th Cir. 1920), *cert. denied* 254 U.S. 644, 41 S.Ct. 14, 65 L.Ed. 454 (1920); *Automotriz del Golfo de California S. A. v. Resnick,* 47 Cal.2d 792, 306 P.2d 1, 4 (1957); Dix, *Adequate Risk Capital: The Consideration for the Benefits of Incorporation,* 53 N.W.U.L.Rev. 478, 491 (1958); *and see Chesapeake Stone Co. v. Holbrook,* 168 Ky. 128, 181 S.W. 953 (1916).

#### *Breach of Duty by Controlling Stockholder*

■ Appellees complain that we erred in resting our holding of a breach of duty by Pointer on the trust-fund doctrine when that doctrine was not pleaded and its requisites were not proved. We adhere to our original holding and point out that the peculiar duty of a controlling stockholder to deal fairly with the corporation, its stockholders, and creditors is broader than the trust-fund doctrine. It rests on his inside knowledge of the corporation's affairs and his opportunity to manipulate them for his personal advantage. *Pepper v. Litton,* 308 U.S. 295, 309–312, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Dix, *supra,* at 493.

■ Breach of that duty may have consequences other than liability as a trustee of corporate assets, particularly when the controlling stockholder has used his control

of corporate affairs to gain an unfair advantage for his individual interests as a creditor. One such consequence may be to treat his advances to the corporation as risk capital by subordinating his claims against the corporation to those of other creditors in a division of corporate assets. *Pepper v. Litton, supra; In re U. Loewer's Gambrinus Brewery Co.,* 167 F.2d 318 (2d Cir. 1948); *Boyum v. Johnson,* 127 F.2d 491, 494 (8th Cir. 1942); *S. G. V. Co. v. S. G. V. Co.,* 264 Pa. 265, 107 A. 721, 722 (1919); *Dix, supra,* at 491. Another may be to subordinate his claims to those of preferred stockholders. *Taylor v. Standard Gas & Elec. Co.,* 306 U.S. 307, 322, 59 S.Ct. 543, 83 L.Ed. 669 (1939). Still another may be to treat the corporation as the stockholder's tool or agent and thus to hold him as well as the corporation liable for the corporation's debts. *Continental Supply Co. v. Forrest E. Gilmore Co.,* 55 S.W.2d 622, 628 (Tex.Civ. App.—Amarillo 1932, writ dism'd); *Oriental Investment Co. v. Barclay,* 25 Tex.Civ.App. 543, 64 S.W. 80, 88 (1901, writ ref'd). Although none of these cases are precisely parallel, they illustrate that the principle is not confined to situations in which a creditor asserts that particular assets formerly held by the debtor corporation constitute a trust fund. Consequently, even though that particular relief was not properly invoked here, we regard our holding that Pointer breached his duty to deal fairly with creditors of his solely-owned corporation as being well sustained by authority and as warranting the imposition of personal liability under the circumstances shown by the undisputed evidence in this case.

### *Plaintiff's Standing to Attack Other Corporations*

In their motion for rehearing appellants raise for the first time the question of plaintiff's standing to attack the separate existence of corporations with which plaintiff has never dealt. We have no difficulty with this question in the case of Heritage Corporation, since, as pointed out in our opinion, it received substantially all of the property of Heritage Building Company and was an integral part of Point-

er's scheme to place that company's assets beyond the reach of its creditors. If the relationship between several corporations is such that they constitute a single business enterprise, a creditor may attack the separate identity of each without showing that he dealt with all of them. *Allright Texas, Inc. v. Simons,* 501 S.W.2d 145, 148 (Tex. Civ.App.—Houston [1st Dist.] 1973, writ ref'd n. r. e.); *Mull v. Colt Co.,* 31 F.R.D. 154, 163 (S.D.N.Y.1962); *Walkovszky v. Carlton,* 24 A.D.2d 582, 583, 262 N.Y.S.2d 334, 336 (1968); *and cf. State v. Lone Star Gas Co.,* 86 S.W.2d 484, 491 (Tex.Civ.App.— Austin 1935, writ ref'd, but reversed on other grounds, 304 U.S. 224, 58 S.Ct. 883, 82 L.Ed. 1304) (relationship between corporations examined in gas rate case to determine whether they constituted a single business enterprise). No such relationship, however, is shown, in the case of East Realty Company, South Management Company, and Heritage Apartment Company. We sustained plaintiff's attack on those corporations on the basis of Pointer's testimony that they had no assets of their own, but merely held title to certain assets owned by him individually. On reconsideration, we conclude that under the facts of this case we are not justified in imposing liability on those corporations for plaintiff's judgment against Heritage Building Company. *Rosenthal v. Leaseway of Texas, Inc.,* 544 S.W.2d 180, 183 (Tex.Civ.App.—Tyler 1976, no writ). All plaintiff is entitled to under this evidence is to pierce the corporate veil with respect to Heritage Building Company and Heritage Corporation.

The motion for rehearing is granted with respect to East Realty Company, South Management Corporation, and Heritage Apartment Company, and the trial court's judgment in their favor is affirmed. Otherwise, the motion for rehearing is overruled.

AKIN, J., dissenting.