**Affirmed in part; Reversed and Remand in part and Opinion Filed February 7, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-22-01057-CV

### MEGATEL C90-2, INC., ARMIN AFZALIPOUR, AND MEGATEL HOMES, LLC F/K/A MEGATEL HOMES, INC., Appellants
### V.
### BANK OF UTAH, Appellee

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-19-11277**

## MEMORANDUM OPINION
Before Justices Carlyle, Goldstein, and Breedlove
Opinion by Justice Breedlove

In this dispute arising from the lease of an aircraft, the trial court rendered judgment for appellee Bank of Utah on its claims and counterclaims against appellants for amounts the Bank alleged were due under the lease. In five issues, appellants challenge the trial court's findings of fact and conclusions of law regarding limitations, alter ego, damages, attorney's fees, and interest. We conclude the evidence is sufficient to support the trial court's rulings regarding limitations and alter ego, but insufficient to support the trial court's damages award. We further

conclude that the 18% contractual interest rate may be applied only to unpaid rent. Accordingly, we affirm the trial court's judgment in part and reverse and remand in part.

## BACKGROUND[1]

In 2015, appellant Megatel C90-2, Inc. (C90)[2] leased a 1991 Cessna CE650 aircraft from appellee Bank of Utah, the trustee for Aereo Limo S.A. de CV, a Mexican aircraft lessor. Appellant Armin Afzalipour signed the lease agreement (Lease) as C90's President. The Lease required rent payments of $11,000 per month, due on or before the fifth day of the month. C90 was also responsible for paying for a minimum number of "flight hours" per year at an hourly rate, whether or not the aircraft was actually used.

The Lease also addressed the parties' responsibilities for maintaining the aircraft. With specific exceptions, C90 was "responsible for all expenses for managing and maintaining the Aircraft," including "pilots, hang[a]r fees, day-to-day maintenance, fuel and parts and insurance," and "all inspections and maintenance." The specific exceptions to C90's responsibilities were "Doc 8 inspection and engine overhauls, hot sections or any other inspections covered" under certain defined

---

[1] The facts recited here are taken primarily from the trial court's extensive written findings of fact made after trial.

[2] The briefs and record are inconsistent in their references to the Megatel entities. To avoid confusion, we will refer to appellant Megatel C90-2, Inc. as "C90" and appellant Megatel Homes, LLC f/k/a Megatel Homes, Inc. as "Homes."

–2–

"Programs"; those would be paid by the Bank. C90, however, was "responsible for delivering the Aircraft to the applicable service providers." C90 was required to continue paying rent while the covered inspections were ongoing, but rent would be abated for periods exceeding 45 days during which the aircraft was undergoing inspections.

C90 was regularly late in making the payments due under the Lease, and by May 2017, owed the Bank over $49,000. The Bank and C90 agreed to execute an extension of the Lease on May 30, 2017, under which C90 agreed to perform certain repairs to the aircraft in exchange for the Bank's waiver of $30,000 in unpaid rent and all of the interest that had accrued. The Lease term was extended through September 30, 2019. The repairs, however, were never performed, and C90's rent payments were made late each month.

In June 2018, the parties arranged for a required "Doc 8" inspection of the aircraft. Under the Lease, the Bank was responsible for paying for Doc 8 inspections. The Bank instructed C90 that the inspection would be undertaken in Monterrey, Mexico by the Mexican company Asertec. On June 29, 2018, C90's pilot Robert Moody flew the aircraft to Mexico for the inspection. Moody brought with him a "squawk list" of items already needing repair on the aircraft. Asertec quoted a price of $35,487.30 for repair of these items, none of which was related to the Doc 8 inspection and all of which affected the aircraft's airworthiness.

The Doc 8 inspection was completed in August and the Bank paid Asertec the fee for conducting it. Because the inspection took 47 days, C90's rent was abated for two days, as provided in the Lease. The Doc 8 inspection revealed numerous repair and maintenance "discrepancies" affecting the aircraft's airworthiness that needed to be repaired before the aircraft could be flown or returned to C90. Asertec's quote to repair these items exceeded $46,000.

Asertec informed C90 and Afzalipour of the discrepancies and the need to repair them so that the aircraft would be airworthy. Asertec also informed them of additional maintenance and repairs that would come due in the next several months. C90 and Afzalipour, however, refused to pay for the repairs. At trial, the Bank contended that C90 abandoned the aircraft in Mexico, while C90 contended that the Bank "held the Aircraft hostage" by demanding "tens of thousands of unauthorized repairs having nothing to do with the Doc-8 maintenance," as C90 alleged in its original petition.

C90 ceased paying rent after June 2018, and also failed to pay amounts owed for flight hours. The Lease expired in September 2019. C90 did not return the aircraft to Houston, Texas in airworthy condition as the Lease required. The trial court's findings of fact detail numerous other fees and expenses that C90 did not pay during the Lease term. Aereo Limo, the aircraft's owner, ultimately sold the aircraft "as is" in January 2022 for $440,000.

C90 filed this lawsuit in August 2019 for breach of contract, alleging it had terminated the Lease in December 2018 because the Bank had not made the necessary repairs to the aircraft and had not returned it to C90. C90 sought a declaration that "the lease was properly terminated and that no further fees are necessary," or in the alternative, damages. The Bank counterclaimed, alleging that C90 breached the Lease first. C90 answered and raised affirmative defenses including limitations and failure to mitigate damages. The Bank later alleged third-party claims against Afzalipour and Megatel Homes, LLC f/k/a Megatel Homes, Inc. (Homes), seeking to impose liability on them under the Lease as C90's alter egos.

The Bank moved for partial summary judgment on its breach of contract counterclaim against C90, arguing that there was no genuine issue of material fact that C90 failed to pay rent and other amounts due under the Lease. The Bank also sought a no-evidence summary judgment on all of C90's affirmative defenses. C90 did not file a response to the Bank's dispositive motions. On April 30, 2021, the trial court granted both the traditional and no-evidence portions of the Bank's motion. The case then proceeded to trial on the parties' remaining claims.

After a bench trial on February 15, 2022, the trial court found for the Bank on its counterclaims for breach of contract, its claims for declaratory relief, and its alter ego claims. The trial court rendered judgment for the Bank in the amount of $1,615,051.41, consisting of (1) $872,929.37 in actual damages, (2) $422,862.10 in trial attorney's fees, (3) $120,750.00 in conditional appellate attorney's fees, and

(4) $198,609.94 in prejudgment interest. In five issues, C90, Afzalipour, and Homes challenge the trial court's judgment.

## STANDARDS OF REVIEW

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Fulgham v. Fischer*, 349 S.W.3d 153, 157 (Tex. App.—Dallas 2011, no pet.). When the appellate record contains a reporter's record as it does in this case, findings of fact are not conclusive and are binding only if supported by the evidence. *Id.* We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question. *Id.* When an appellant challenges the factual sufficiency of the evidence on an issue, we consider all the evidence supporting and contradicting the finding. *Id.* We set aside the finding for factual insufficiency only if the finding is so contrary to the evidence as to be clearly wrong and manifestly unjust. *Id.*

In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *Id.* As long as the evidence falls "within th[e] zone of reasonable disagreement," we will not substitute our judgment for that of the fact-finder. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex. 2005).

We review de novo a trial court's conclusions of law. *Fulgham*, 349 S.W.3d at 157. We are not bound by the trial court's legal conclusions, but the conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory

supported by the evidence. *Id.* at 157–58. Incorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory. *Id.*

The trial court also granted summary judgment on some issues prior to trial. We review a summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). We review the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc.*, 289 S.W.3d at 848. Our review of an order granting a no-evidence summary judgment requires us to determine under the same legal sufficiency standard used to review a directed verdict whether the non-movant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *Bradford Partners II, L.P. v. Fahning*, 231 S.W.3d 513, 517 (Tex. App.—Dallas 2007, no pet.).

## DISCUSSION

### 1. Limitations

In their first issue appellants contend the Bank's claims are barred by the contractual one-year limitations period in the Lease. They rely on Lease Article XIII,

providing that "[t]his Lease will be governed by the laws of the United States and the State of New York as though the entire contract were performed in New York and without regard to New York's conflict of laws statutes/rules," and Lease Article III.B, providing that "any suit arising out of this Lease for any reason" must be brought "within one (1) year from the date of the incident giving rise to such action and in no event later than one (1) year after the expiration of this agreement." They argue that under New York law, parties may shorten the statute of limitations by contract, and the parties here did so.

The Bank responds that C90 waived its contractual limitations defense. The Bank filed a traditional and no-evidence motion for partial summary judgment on "certain elements of its breach of contract claim," and also sought "rulings that [C90's] affirmative defenses fail as a matter of law." The Bank argued that the statute of limitations on its claims for breach of contract and declaratory judgment was four years, and there was no evidence that "any of the claims for which [the Bank] seeks damages accrued outside the applicable four-year limitations period."

C90 did not file a response to the Bank's motion for summary judgment and did not assert its limitations argument when the motion was heard. At the hearing, the trial court asked:

> THE COURT: Tell me why there's no response to the Motion for Summary Judgment.
>
> [COUNSEL FOR C90]: Your Honor, the amounts on the Partial Summary Judgment are undisputed, and we reserve the rights to contend with other defenses for any future summary judgment motion

–8–

that might be filed, but with respect to the issues in front of the Court this time, there is no—they're undisputed.

*THE COURT:* Motion for Summary Judgment is granted.

C90 and Afzalipour[3] subsequently moved for summary judgment alleging among other grounds that New York law applied, the contract provided for a one-year limitations period, and the Bank did not file suit within one year of the alleged breach. Appellants now argue that "[t]he Bank's claims are barred by the contractual one-year limitations period in the Lease." We disagree.

In ruling on the Bank's motion, the trial court was not required to identify and consider grounds the parties had not raised. In *Holmes v. Dallas International Bank*, 718 S.W.2d 59, 60 (Tex. App.—Dallas 1986, writ ref'd n.r.e.), we quoted civil procedure rule 166A(c)'s requirement that "[i]ssues not expressly presented to the trial court by written motion, answer or other response shall not be considered as grounds for reversal," and explained "it is no longer the duty of the trial court or appellate court to sift the summary-judgment record to see if there are fact issues that could be raised by the opposing party, but were not." *Id.*

Appellants also argue that the trial court erred by "refusing to reconsider" the partial summary judgment for the Bank on limitations. Although appellants filed more than one motion requesting that the trial court reconsider its summary judgment ruling, apply New York law, and rule that the Bank's claims were barred

---

[3] At the time, Homes was not yet a party to the lawsuit.

–9–

by limitations, appellants obtained a ruling from the trial court only once. On January 24, 2022, the trial court signed an order denying their "Motion Requesting that the Court Apply New York Law." Accordingly, appellants preserved their complaint about the trial court's "refus[al] to reconsider" only as to that motion. TEX. R. APP. P. 33.1(a) (to preserve complaint for appeal, appellants must show they made a timely complaint to the trial court and obtained a ruling, or that they objected to the trial court's refusal to rule).

The trial court was not required to reconsider its prior ruling granting summary judgment on C90's limitations defense. After a court grants a summary judgment motion, the court generally has no obligation to consider further motions on the issues adjudicated by the summary judgment. *See Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 651 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The standard of review for a motion to reconsider a prior summary judgment is whether the trial court abused its discretion. *Id.* A trial court does not abuse its discretion if the movant cites no additional evidence beyond the evidence available to him when the first summary judgment was granted. *Tex. Petroleum Land Mgmt., LLC v. McMillan*, 641 S.W.3d 831, 850–51 (Tex. App.—Eastland 2022, no pet.) (collecting cases). In their motion to reconsider, appellants relied on the Lease's limitations provision. The Lease was the subject of C90's original claim for breach of contract that initiated this lawsuit, and accordingly evidence of its terms has been available from the outset of this litigation. Accordingly, we conclude the trial court

–10–

did not err by finding that the Bank's claims for breach of contract were made within the limitations period, and did not abuse its discretion by refusing to reconsider the issue.

Afzalipour[4] asserts that while the trial court dispositively ruled that the Bank's breach of contract claims against C90 were not barred by limitations, the court's legal ruling on that issue should not apply to him because he timely raised the defense after the Bank joined him in the suit as a third-party defendant. The Bank responds that the trial court did not err by striking Afzalipour's affirmative defenses, including limitations, because Afzalipour lacked standing.

The Bank did not assert any contract-based claims against Afzalipour because he was not a party to the Lease. Rather, the Bank sought to hold Afzalipour liable for the breaches committed by C90 under an alter ego theory of liability. Where, as here, the corporate veil is pierced, "the shareholders are considered the equivalent of the corporation, not separate parties with individual defenses." *See Stover v. ADM Milling Co.*, No. 05-17-00778-CV, 2018 WL 6818561, at *5 (Tex. App.—Dallas Dec. 28, 2018, pet. denied) (mem. op.) As we explained in *Stover*, "[t]he individual shareholders are only injured when the corporate veil is pierced." *Id.* "[W]hether the corporate veil is pierced is the *only* issue about which [individual shareholders] have

---

[4] Homes joins Afzalipour's argument but, because of its late joinder in the suit, did not assert any affirmative defenses until it filed its original answer after trial. In any event, assuming Homes timely raised the defense, we would apply the same analysis and conclude that Homes lacked standing to assert that the Bank's claims for breach of contract are barred by limitations.

standing to complain with respect to the findings against the corporation." *Id.*; *see also Menetti v. Chavers*, 974 S.W.2d 168, 170–72 (Tex. App.—San Antonio 1988, no pet.) ("[O]nce the default judgment was entered against the corporation, liability was established, and [the alter ego defendants] had no right to present a defense on the existence of liability for the underlying claim.").

Accordingly, we conclude that Afzalipour and Homes lacked standing to challenge the trial court's ruling granting the Bank's motion for summary judgment on its breach of contract claim. *See Stover*, 2018 WL 6818561, at *6. We overrule appellants' first issue.

### 2. Alter ego

In their second issue, appellants contend the trial court erred by holding that Afzalipour and Homes are liable under an alter ego theory. They argue (1) there is no viable cause of action against C90 for which they can be held liable as C90's alter egos, and (2) the evidence is legally and factually insufficient to support the requisite findings, particularly of actual fraud, to pierce C90's corporate veil here.

We reject appellants' first argument because we have already concluded that the Bank's breach of contract claim is not barred by limitations, and there is evidence to support the trial court's findings that C90 failed to pay amounts due under the Lease. We now turn to appellants' second argument and consider the sufficiency of the evidence to support the trial court's alter ego findings.

The trial court made twenty-eight detailed fact findings under the heading "Alter Ego and Veil Piercing." The trial court's findings focused, among other things, on the purpose for which C90 was formed, C90's gross undercapitalization, and the control and personal benefit that Azfalipour and Homes retained pursuant to the Lease without accepting any risk of contractual lialibilty.

The trial court found that C90 "had no purpose other than to serve as a holding shell for aircraft related liability, while Afzalipour and [Homes] retained the benefit of the use of those aircraft," and "Afzalipour signed the Lease and Amendment on behalf of [C90] knowing that [C90] would never have the assets required to pay any debts or obligations in the event it was sued." The trial court further found that Afzalipour and Homes "benefited by obtaining use of the Aircraft with no risk of contractual liability in the event of nonpayment or default." The court also found:

- "Afzalipour ensured [C90] was grossly undercapitalized and could never have any assets to pay its debts, legal obligations, or contractual obligations under the Lease";

- "There was no substantive capital or cash contribution to [C90] from any individual or entity at any time from the date of its formation";

- "The initial stock issued to [Homes] was without any payment to capitalize the entity," even though C90 "needed well in excess of $400,000 at Lease inception to ensure it could meet its minimum Lease obligations";

- Homes "chose not to capitalize [C90]" despite having the funds to do so, and

- "At no time did [C90] have the ability to make a single payment under the Lease."

We begin by addressing the trial court's finding that Afzalipour created C90 "so he could execute leases and purchases of aircraft to be used for his personal use or the use of [Homes], but in a way that would provide him and [Homes] protection from any liability." The fact that C90 was admittedly organized to isolate Afzalipour from personal liability does not alone support piercing the corporate veil. The supreme court has explained, "[c]reation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008).

However, the trial court not only found that C90 was organized to insulate liability, it also found that Afzalipour grossly undercapitalized C90 and "set [it] up so it could be an empty shell to incur liability and would have no assets to satisfy those liabilities." "Afzalipour then used the aircraft leased by this shell entity for his personal needs and the needs of his various Megatel entities without exposing them to any risk."

Undercapitalization alone would be insufficient to support an alter ego claim. *Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15, 26 (Tex. App.—Texarkana 2012, no pet.) (citing *Torregrossa v. Szelc*, 603 S.W.2d 803, 804–05 (Tex. 1980)); *Durham v. Accardi*, 587 S.W.3d 179, 185–86 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (same). However, "[g]rossly inadequate capitalization, as measured by the

nature and magnitude of the corporate undertaking, is an important factor in determining whether personal liability should be imposed." *Tigrett v. Pointer*, 580 S.W.2d 375, 382 (Tex. App.—Dallas 1978, writ ref'd n.r.e.).

The court cited Afzalipour's control over C90's debts and his direct responsibility for breaches of the Lease, concluding that "Afzalipour intentionally withheld payments due under the Lease," and knew at the time of entering the Lease and the amendment that "he had no intention that [C90] would comply with the terms of the Lease." The court concluded that Afzalipour's use of C90 "as a mere tool or business conduit for himself" "constituted an actual fraud on [the Bank] for his personal benefit," and "Afzalipour deceived [the Bank]."

Section 21.223(b) of the Texas Business Organizations Code imposes liability on corporate owners "if the obligee demonstrates" that the holder or owner "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit" of the holder or owner. *Id.* § 21.223(b). "[I]n the context of piercing the corporate veil, actual fraud is not equivalent to the tort of fraud. Instead, [it] involves dishonesty of purpose or intent to deceive." *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.) (internal quotation omitted).

The supreme court explained in *SSP Partners* that to establish alter ego liability, "[t]here must also be evidence of abuse, . . . injustice and inequity," specifically, "fraud, evasion of existing obligations, circumvention of statutes,

monopolization, criminal conduct, and the like." *SSP Partners*, 275 S.W.3d at 455. The court continued, "[s]uch abuse is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a 'bedrock principle of corporate law'—that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations." *Id.* (footnote omitted).

Afzalipour's testimony supports these findings. He explained that C90 was formed in 2011 when Homes needed an airplane to transport its employees to oversee its new and expanded operations. He testified that C90 was never capitalized even though Homes had sufficient assets to do so. Afzalipour testified that after C90's formation, C90 had no "meetings or votes." Afzalipour also admitted that C90 had never had a bank account. He explained "there was no need" because "[t]here was always enough capital available in [Homes] to provide the service to C90." Afzalipour testified that C90 had never had its own employees. He testified that C90 had always "filed its taxes as part of [Homes]," all accounting and management of C90 was performed by Homes's employees, and both companies were operated out of the same office.

Afzalipour testified that he was the only person with authority to enter contracts or agreements on behalf of Homes and was the "ultimate decider" on Homes's behalf. He admitted that neither he nor Homes had a written contract with C90 to reimburse C90 for expenses related to the aircraft.

To explain the lack of documentation for C90's formation and operation, Afzalipour testified that Homes and C90 had a verbal "shared services agreement" that had been in effect since C90's formation in 2011. Under this verbal agreement, C90 provided transportation services to Homes, and Homes provided services to C90 "such as paying for their financial obligations and providing back-office support." Afzalipour explained:

> C90 had access to [Homes's] employee for processing the payments, services, and also C90 used [Homes's] employee for approving or disapproving the maintenance. In return, [Homes] has paid for the cost that was associated to C90. And also [I] have provided services as a [Homes] employee to C90 such as elaborating on the needs that C90 has, or still has . . . [including] [c]oordinating with the pilot and service manager for servicing the airplane, coordinating with different FBOs for approving or disapproving the services such as gas, laboratory and also scheduling the trips for the pilots and staff members.

The trial court did not find Afzalipour's testimony about the shared services agreement to be credible:

> [Finding of Fact] 101. This Court determines no oral Shared Services Agreement existed as alleged by [C90], Afzalipour, or [Homes]. [C90], Afzalipour, and [Homes] were represented by counsel at all relevant times regarding the matters at issue before this Court. Despite this, there is no written document or any evidence other than the testimony of Afzalipour corroborating the claimed Shared Services Agreement. To the extent Afzalipour testified to the existence of a Shared Services Agreement, this Court deems such testimony not credible or reliable.

> 102. Neither Afzalipour nor [Homes] had any written agreement requiring them to reimburse C90 for any use of the Aircraft. Afzalipour knew that [C90] could abandon the Aircraft and breach the Lease because he had set up [C90] to insulate himself and [Homes] from liability.

–17–

Afzalipour also admitted that at the time of trial, C90 had no cash assets and did not "own anything of value." Afzalipour testified that in 2018, on the advice of counsel, C90's shares were transferred to Afzalipour's family trust with all other Megatel entities. Homes's stock "is currently controlled solely" by the family trust. Afzalipour admitted he had no record of any compensation paid to C90 or Homes for the shares. The trial court concluded that Afzalipour "has structured [C90] so that [the Bank] will be unable to recover the amounts due, as was Afzalipour's intent all along." Citing Afzalipour's transfer of C90's shares "to his Wyoming LLC, which was created to insulate him from liability and defraud Megatel's creditors," the trial court concluded that C90 "has been used to perpetrate a fraud on aircraft owners, and in relation to this Lease, specifically to defraud or deceive [the Bank]."

In *Latham*, we concluded that where a corporation's owners formally dissolved the corporation and distributed its assets to themselves knowing of the plaintiff's claims, there was evidence to support a finding of the "actual fraud" required for piercing the corporate veil under business organizations code § 21.223(b). *See Latham*, 320 S.W.3d at 608–10. Although the Bank did not file suit until 2019, the parties' disputes about the aircraft and the Lease began in 2017 before the parties signed the Lease amendment, and escalated after the aircraft was taken to Mexico in June 2018. We conclude this evidence supports the trial court's findings and conclusions that the transfer of C90's shares was made with the intent to defraud C90's creditors.

–18–

We conclude that evidence of C90's "grossly inadequate capitalization," combined with evidence that Afzalipour and Homes intended to deceive and defraud C90's creditors, supports the trial court's findings and conclusions. *See* TEX. BUS. ORG. CODE §221.223(b) (holder or owner who caused corporation to be used for purpose of perpetrating fraud, and did perpetrate fraud primarily for the holder or owner's direct personal benefit, may be liable as alter ego); *Tigrett*, 580 S.W.2d at 382 (grossly inadequate capitalization is an important factor in determining whether personal liability should be imposed); *Latham*, 320 S.W.3d at 607 (actual fraud for purposes of piercing corporate veil involves dishonesty of purpose or intent to deceive). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) (discussing claim for fraudulent misrepresentation). Here, the trial court made express findings of Afzalipour's intent to deceive after weighing the credibility of Afzalipour's testimony, citing facts in evidence to support its conclusions. Because we conclude the evidence is sufficient to support the trial court's alter ego findings, we overrule appellants' second issue. *See Latham*, 320 S.W.3d at 608–10.

### 3. Damages

In their third issue, appellants contend that "[r]egardless of liability, actual damages of $872,829 cannot stand." Appellants concede that if liability is found, there was evidence to support $89,346.48 of the total damages awarded. But they

challenge (1) $520,000 awarded for diminution in the aircraft's value, (2) $233,482.89 in alleged unpaid rent and flight hours between August 2018 and September 2019 when C90 did not have possession of the aircraft, and (3) $30,000 for "failure to perform promised repairs" that appellants allege is duplicative of other damage awards.

Regarding damages for diminution of the aircraft's value, the trial court found:

> 73. Aereo Limo sold the Aircraft in January 2022 for $440,000.00. The Aircraft was sold in an as is condition and all repairs needed by the Aircraft were to be performed by the buyer. The buyer determined the Aircraft was in need of substantial maintenance and repairs, including maintenance and repairs that have [sic] were due since before May 2019. If the Aircraft were current on maintenance and repairs, the buyer would have agreed to a purchase price in excess of $960,000.00. Aereo Limo accepted a reduced purchase price to account for buyer's expectation that it would have to perform all required maintenance and repairs to place the Aircraft in airworthy condition. The diminution in value of $520,000.00 was due to the failure of Megatel to return the Aircraft in the required condition under the Lease.

The standard for measuring damage to personal property is the difference in market value immediately before and immediately after the injury, at the place where the damage occurred. *Thomas v. Oldham*, 895 S.W.2d 352, 359 (Tex. 1995). Therefore, to support damages in the amount of $520,000 for diminution of value, there must be legally sufficient evidence of: (1) the aircraft's value of $960,000 immediately preceding the alleged injury, and (2) the aircraft's value of $440,000 immediately after the injury.

To establish the aircraft's value both preceding and immediately after the injury, the Bank offered the testimony of Gerardo Adrian Medellin de la Cerda, the Senior Legal Manager for Marcatel, a company affiliated with Aereo Limo SA de CV. Aereo Limo was the owner of the aircraft at the time it was leased to C90.

Medellin de la Cerda testified that the aircraft was sold to Aerotransportes Internacionales de Torreon S.A. de C.V. on January 26, 2022, for $444,000. The trial court admitted into evidence a two-page document entitled "Offer to Purchase" signed by representatives of the buyer and seller on January 26, 2022. This document provides:

> 1. PURCHASE PRICE: The purchase price of the Aircraft shall be Four Hundred & Forty Thousand United States Dollars ($440,000.00 USD), hereinafter ("Purchase Price"). The Aircraft is being sold in an as is condition and all repairs needed by the Aircraft shall be at Buyer cost. The Parties agree that the Aircraft is in need of substantial maintenance and repairs, including maintenance and repairs that have been due since before May 2019. If the Aircraft were current on maintenance and repairs, the Parties agree the purchase price would have exceeded Nine Hundred Thousand United States Dollars ($960,000.00 USD), as noted in the VREF Valuation attached as Exhibit A. The parties have agreed to reduce the Purchase Price to account for Buyer's expectation that it will perform all required maintenance and repairs to place the Aircraft in airworthy condition.

Appellants assert that the Bank's evidence of the aircraft's market value was legally insufficient because it was not offered through an expert or supported by an independent assessment. On this issue, we disagree. "A property owner may testify as to the value of his property." *Natural Gas Pipeline Co. of America v. Justiss*, 397 S.W.3d 150, 155 (Tex. 2012).

However, the inquiry does not end there. While a property owner is permitted to testify about the market value of his property, that opinion must be "based on the owner's estimate of market value and not some other value." *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 785 (Tex. 2020) (internal quotation omitted). If a property owner testifies that he is familiar with the property's value, the "testimony must show that it refers to market, rather than intrinsic, value of the property." *Culwell v. Diaz*, No. 05-12-00093-CV, 2013 WL 2609995, at *3 (Tex. App.—Dallas June 7, 2013, no pet.) (mem. op.) (citing *Ford Motor Co. v. Cooper*, 125 S.W.3d 794, 800 (Tex. App.—Texarkana 2004, no pet.)).

To support his opinion that the aircraft had a value of $960,000 preceding the injury, Medellin de la Cerda referred to the Offer to Purchase wherein the parties agreed that if the aircraft were current on maintenance and repairs, the purchase price would have exceeded $960,000.00. Medellin de la Cerda also testified that if C90 "had performed [its] obligations then the airplane would be in airworthy condition and it would be valued near $1 million." He admitted, however, that the valuation had no specific information relating to the aircraft at issue, and included a proviso that "[p]rices can vary widely due to time, condition[,] maintenance history and equipment." Neither the agreement between the parties nor Medellin de la Cerda's personal opinion of the aircraft are supported by marketplace considerations.

The Bank's evidence of the value of the aircraft after the injury is also flawed. The only evidence the Bank relied on was the price stated in the Offer to Purchase.

Evidence of purchase price alone cannot establish market value. *Pike*, 610 S.W.3d at 784 & n.27. "[P]urchase price is merely a starting point for calculating actual value." *Id.* at 784. Proof of market value requires evidence of a willing seller who is under no necessity of selling. *Id.* at 785. There is no such evidence in the record.

We conclude the evidence is legally insufficient to support a finding on the aircraft's value preceding the alleged injury or immediately after the injury. Therefore, there is legally insufficient evidence to support an award of damages for diminution in value of the aircraft.

The Bank argues that if the diminution in value award is reversed, "the Court should award the Bank its alternate damages (cost of repair)" in one of the alternative amounts the trial court calculated in its Conclusion of Law 20(G)(1) or (2).[5] Through the testimony of Michael Fleming, an FAA-licensed mechanic with 47 years of experience in the aircraft maintenance field, the Bank offered evidence of the reasonableness and necessity of the repairs to make the aircraft airworthy. Fleming also distinguished between costs delegated to the lessor and costs delegated to the lessee under the Lease, and included only the latter in his opinions. Although appellants argue that the repair costs are not recoverable because the Bank did not actually repair the aircraft, they cite no authority for this proposition.

---

[5] The alternative amounts are (1) $113,789.18 in U.S. dollars, based on three quotes from Asertec (AeroServicios Técnicos Regiomontanos S.A. de C.V.), or (2) $84,060.30 in U.S. dollars plus 1,738,550 in Mexican pesos, based on a different Asertec quote. The Bank calculates the total of the latter amount to be $168,371.20 in U.S. dollars, using the exchange rate in the trial court's judgment.

Appellants also argue that repair costs are not recoverable because the Bank failed to mitigate its damages. The Bank obtained summary judgment on appellants' affirmative defenses including failure to mitigate, and the record does not reflect that appellants raised the issue again at trial or in a motion for new trial. Accordingly, the Bank contends appellants have not preserved their complaint. Assuming preservation, we conclude the evidence does not support a finding that the Bank failed to mitigate its losses.

Appellants bore the burden of proof on their affirmative defense. *See Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 135 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (breaching party had burden of proving that damages could have been mitigated). Appellants' argument is premised on their contention that the aircraft was in the Bank's control after the Doc 8 inspection, and the Bank "let the Aircraft sit idle and fall into further disrepair." But the trial court found that C90 "left the Aircraft in Mexico" at a facility that was not under the Bank's ownership and control. The trial court also found that the aircraft required over $35,000 in repairs even before the Doc 8 inspection, and the Doc 8 inspection identified multiple airworthiness items to be repaired at a cost of almost $47,000. The Lease assigned these expenses to C90.

A claimant "should minimize damages by taking affirmative steps, when applicable, to stop the accumulation of losses." *Wyde v. Francesconi*, 566 S.W.3d 890, 895 (Tex. App.—Dallas 2018, no pet.). But the "affirmative steps" required are

–24–

"reasonable exertions" or "trifling expense." *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999) ("Under mitigation principles, the long-standing law of this state requires a claimant to mitigate damages if it can do so with trifling expense or with reasonable exertions." [internal quotation omitted]); *Wyde*, 566 S.W.3d at 895 (same). Appellants do not suggest what trifling expense or reasonable exertion the Bank could have undertaken in mitigation of its damages. Assuming appellants preserved their complaint, we conclude they failed to meet their burden to prove that the Bank's damages could have been mitigated. *See Gunn Infiniti, Inc.*, 996 S.W.2d at 857; *Cook Composites, Inc.*, 15 S.W.3d at 135. Accordingly, the doctrine of mitigation does not preclude the Bank from recovering damages for C90's breach of contract in an amount the trial court may determine on remand.

Appellants also challenge the trial court's awards of (1) $233,429.89 for unpaid rent and flight hours when C90 did not have possession of the aircraft, and (2) $30,000 for failure to perform certain repairs. Regarding the first of these awards, appellants argue that under Article I, paragraph A.1 of the Lease, rent payments are suspended for any period greater than 45 days during which the aircraft is "undergoing Doc 8 inspection, engine overhauls, hot sections, or any other inspections covered under any of the Programs" defined in the Lease. Appellants contend that 45 days after C90 delivered the aircraft to Mexico, the rent was abated and the abatement was never lifted. Appellants also argue that because C90 did not have possession of the aircraft after it was delivered to Mexico, it could not have

met the required flight hours. Appellants contend that the Bank's refusal to return the aircraft rendered C90's performance impossible.

As the Bank argues, however, whether the Bank withheld the aircraft after the failed inspection was a fact issue the trial court resolved in the Bank's favor based on the credibility of the evidence presented at trial. The trial court expressly found that the aircraft was not in the Bank's possession while at Asertec's facility. Further, the trial court granted the Bank's no-evidence summary judgment motion on all of C90's affirmative defenses, including impossibility.

Next, appellants contend that the trial court's award of "$30,000 for failure to perform promised repairs in exchange for a waiver of past due rent" is already included in the trial court's award of $113,789 for repairs "or constitutes unpaid rent already included in the Bank's rent recovery amount." Citing evidence in the record, the Bank responds that the $30,000 credit was a waiver of unpaid rent due prior to May 30, 2017, while the unpaid rent awarded in the judgment was for March through May, 2018. We conclude there was sufficient evidence to support the trial court's findings and conclusions regarding the amounts awarded, and we overrule appellants' challenges to those amounts. *See Fulgham*, 349 S.W.3d at 157–58.

We conclude that there is legally sufficient evidence to affirm the trial court's awards of damages for cost of repairs, unpaid rent and flight hours, and damages for failure to perform repairs, which are undisrupted by our determination that there is legally insufficient evidence to affirm the award of damages for diminution of value.

–26–

We therefore sustain the portion of appellants' third issue challenging the sufficiency of the evidence to support the trial court's finding that the value of the aircraft was diminished by $520,000, and overrule the remainder of appellants' challenges.

**4. Attorney's fees**

In their fourth issue, appellants challenge the trial court's attorney's fee awards to the Bank. They contend (1) no fees are recoverable under the Lease's terms, (2) the Bank failed to segregate its fees between recoverable and unrecoverable claims, and (3) if this Court reduces the actual damages award, remand for a new trial on attorney's fees is required. The Bank responds that the trial court's award was proper and segregation was not required.

Appellants first argue that because the Lease includes provisions permitting recovery of attorney's fees under certain specific circumstances, attorney's fees may not be recovered under any other, different circumstances. Article I, paragraph A.13 of the Lease provides that "[i]f a default occurs under this Lease," an attorney appearing for C90 in "any and all actions that may be brought for sums due hereunder by [C90]" may confess judgment against C90 for the amount due, interest, and costs, "together with an attorneys' commission for collection of five percent (5%)." Paragraph I.A.14 of the Lease provides that when the Lease has been terminated, an attorney may appear for C90 and confess judgment for possession of the aircraft. Paragraph I.A.15 provides that C90 waives any claim against "any attorney engaging in the activities authorized" by paragraphs I.A.13 and 14 and will

–27–

indemnify the attorney "for any action brought in violation of the foregoing." We conclude that these provisions do not preclude the Bank's recovery of its attorney's fees incurred in pursuing its breach of contract claims.

C90 cites our opinion in *Mundheim v. Lepp* in support of its argument that Lease paragraphs I.A.13 through 15 preclude recovery of attorney's fees here. No. 05-19-01490-CV, 2021 WL 1921122, at *9 (Tex. App.—Dallas May 13, 2021, pet. denied) (mem. op.). But in that case, the agreement at issue provided that each party would bear its own attorney's fees incurred in any "future Litigation or Attorney review of this document." *Id.* We explained that "parties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's," and when parties include such a provision, "the language of the contract controls, rather than the language of the statute." *Id.* (internal quotations omitted). Here, however, the parties' agreement addresses payment of fees to an attorney who appears for C90 to confess judgment, not fees incurred in a breach of contract dispute between the parties.

In *Sharifi v. Steen Automotive, LLC*, the parties' agreement for sale of a business provided that each party would pay its own legal, accounting, and closing costs. 370 S.W.3d 126, 153 (Tex. App.—Dallas 2012, no pet.). We concluded that the agreement "addresses only the sale of the business and does not address or purport to govern expenses incurred in subsequent litigation," and did not preclude Steen's recovering its fees under chapter 38 of the Texas Civil Practice and

Remedies Code. *Id.* at 153–54. We reach a similar conclusion here, where the parties made no agreement about fees incurred by either party in future breach of contract litigation, agreeing only that an attorney who appeared for C90 to confess judgment could recover fees for doing so.

C90 next argues that the Bank failed to segregate its non-recoverable fees for defending against C90's breach of contract claim or for prosecuting its alter ego claims against Afzalipour and Homes. The Bank responds that the fees are recoverable because they are "intertwined" with its fees for litigating its breach of contract claim. In *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006), the court explained that "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated."

"Legal services that would have been incurred on a recoverable claim are not disallowed simply because the services also further non-recoverable claims." *Hizar v. Heflin*, 672 S.W.3d 774, 802 (Tex. App.—Dallas 2023, pet. filed). "Further, fees incurred to overcome any and all affirmative defenses or to defend against a counterclaim that must be overcome to fully recover on the claim allowing fees do not require segregation." *Id.* (internal quotation omitted). The need to segregate attorney's fees is a question of law, and the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Tony Gullo Motors I, L.P.*, 202 S.W.3d at 312–13.

Here, the Bank provided detailed evidence[6] of its fees, including testimony that segregation was unnecessary because both parties asserted breach of contract and declaratory judgment claims. The Bank's attorney testified that the parties' claims were "two sides of the same coin." C90 sought declaratory relief from the outset. *See Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 600 (Tex. App.—Dallas 2015, pet. denied) (trial court could award defendant its attorney's fees based on plaintiff's declaratory judgment suit where defendant pleaded for its fees for defending the declaratory judgment claim). The Bank also pleaded for declaratory relief and for recovery of its fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (under Declaratory Judgments Act, trial court may award "costs and reasonable and necessary attorney's fees as are equitable and just").

Appellants argue that C90's breach of contract claim "presented distinct issues relating to the condition of the Aircraft at the time of sale," and "the Bank's alter-ego claims against Afzalipour and [Homes] required proof of elements unrelated to the parties' obligations under the Lease." However, the trial court could have concluded that issues about the aircraft's condition and how that condition affected the parties' contractual obligations were inextricably intertwined with the

---

[6] In fact, the record reflects that the trial court requested a summary of the attorney's fees evidence initially submitted by the Bank.

parties' competing claims for breach of contract and declaratory judgment requests. *See Tony Gullo Motors I, L.P.*, 212 S.W.3d at 313–14; *Hizar*, 672 S.W.3d at 802.[7]

The Bank offered evidence that its fees were intertwined and that segregation was not necessary. Appellants did not offer competing evidence, objecting only to the fees sought for "prosecuting [the Bank's] counterclaims for declaratory relief and breach of contract and for defending against [C90's] claim for declaratory relief" "to the extent these fees are not properly segregated." *See Cooper v. Cochran*, 288 S.W.3d 522, 536–37 (Tex. App.—Dallas 2009, no pet.) (where appellant failed to point to instances of legal services for appellees' claims where segregation would be appropriate, he failed to carry his burden to show why appellees' evidence of unsegregated fees was insufficient). The trial court found that "all prerequisites to recovery of attorney's fees and expenses under Chapter 37 were met" by the Bank. The Bank could recover its fees under these circumstances. *See Mikob Props., Inc.*, 468 S.W.3d at 600. On this record, we conclude that the Bank offered sufficient evidence to support the trial court's findings and conclusions that its award of fees to the Bank was reasonable and necessary, and equitable and just. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

We conclude that attorney's fees are recoverable, but our reversal of the damages awarded requires remand for reconsideration of the amount of fees

---

[7] Further, alter ego "is not an independent cause of action, but is instead a means of imposing liability for the underlying cause of action." *Dodd v. Savino*, 426 S.W.3d 275, 291 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

awarded. *See Young v. Qualls*, 223 S.W.3d 312, 314–15 (Tex. 2007) (per curiam) (remanding attorney's fee issue to trial court after reducing the damages awarded by "nearly two-thirds on appeal"). We sustain appellants' fourth issue in part and remand to the trial court for reconsideration of the attorneys' fees awarded to the Bank.

### 5. Interest

The trial court awarded prejudgment interest "of 18% per annum" on principal damages of $872,829.37. As we have discussed, this principal amount included not only past rent due but also nine other categories of damages, including diminution in value of the aircraft.[8] In their final issue, appellants contend the prejudgment interest award should be vacated, or in the alternative, reduced to a 5% interest rate. The Bank responds that the 18% award conforms to the contract and to "equitable principles governing prejudgment interest."

Paragraph I.A.3 of the Lease addresses interest, and provides that "[i]nterest of one and a half percent (1 ½%) per month, where any part of a month will be deemed a whole month, but not more than that maximum rate of interest permitted by law, will accrue on payments due from Lessee that are past due." Appellants argue this provision applies only to past due rent payments, while the Bank argues

---

[8] The trial court's Conclusion of Law 20 details these categories of damages, for (A) failure to perform promised repairs, (B) flight hours, (C) rent, (D) CESCOM platform annual renewal, (E) annual subscription to the navigation database, (F) updates to the navigation database, (G) failure to perform maintenance and inspections, including diminution in value of the aircraft, (H) removal of the Megatel logo, (I) hangar fees, and (J) insurance.

it applies to all "monetary obligations imposed on [C90]." We construe contractual provisions under a de novo standard of review, looking to the language of the agreement to ascertain the parties' true intentions as expressed in the writing. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019).

The interest provision is the third subparagraph in Article I, part A of the Lease, entitled "Fees and Responsibilities." Paragraph I.A.1 sets forth the monthly rent due, providing that "Lessee shall pay Lessor a fee of $11,000 USD per month (the "Rent") during the term hereof and until the Aircraft is returned to Lessor in accordance herewith. . . . The foregoing payments be [sic] due on or before the 5th of each month without invoice." The paragraph continues with details about how payments may be made, and permits the lessor to require payments to be made by wire transfer if the lessee has failed to make any payment "when or before due." Next, the paragraph details the parties' responsibilities for other expenses, but does not provide for any other "payments" to be made by the lessee to the lessor. Paragraph I.A.2 provides for return of the aircraft to the lessor, and does not reference any fees or other payments. Paragraph I.A.3 follows, with its requirement that interest "will accrue on payments due from Lessee that are past due."

Appellants contend that paragraph I.A.3's interest provision applies "only to rent payments, not damages in the event of breach generally, as evidenced by the fact that the only type of interest the Lease authorizes is calculated on a monthly

–33–

basis, according to when rent payments are due." Appellants conclude that prejudgment interest on amounts other than past due rent should be calculated based on the statutory rate provided in the Texas Finance Code.

We conclude that paragraph I.A.3's interest provision applies only to the monthly "payments due from Lessee"—specifically, rent—and not the lessee's other financial obligations under the Lease. Paragraph I.A.3's placement in the contract, directly after the rent obligation is detailed but before the contract addresses other charges such as hourly rates for operation of the aircraft and the security deposit, supports this construction. None of the paragraphs setting forth these other charges describes or details any monthly payment to be made, and paragraph I.A.3 expressly provides a monthly interest rate "where any part of a month will be deemed a whole month." Accordingly, we conclude the trial court erred by awarding prejudgment interest at the contractual rate on damages other than past due rent.

The trial court, however, had discretion to award prejudgment interest at the statutory rate on the other amounts awarded in the judgment. *See, e.g., Siam v. Mountain Vista Builders*, 544 S.W.3d 504, 512 (Tex. App.—El Paso 2018, no pet.) (collecting cases for proposition that "[w]hen the interest rate is not specified in a contract, prejudgment interest in a breach of contract case is calculated as simple interest and is based on the postjudgment interest rate applicable at the time of judgment."). We sustain appellants' fifth issue in part and reverse the portion of the

trial court's award of 18% prejudgment interest on damages other than past rent due under the Lease.

## CONCLUSION

We reverse the portions of the trial court's judgment (1) awarding the Bank $520,000 for diminution of the aircraft's value and (2) awarding 18% prejudgment interest on amounts other than past due rent. We remand those issues to the trial court for further proceedings consistent with this opinion, and for reconsideration of the amount of attorney's fees to award the Bank after consideration of these matters. In all other respects, the trial court's judgment is affirmed.

221057f.p05

/Maricela Breedlove/
MARICELA BREEDLOVE
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MEGATEL C90-2, INC., ARMIN
AFZALIPOUR AND MEGATEL
HOMES, LLC F/K/A MEGATEL
HOMES, INC., Appellants

No. 05-22-01057-CV      V.

BANK OF UTAH, Appellee

On Appeal from the 14th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-19-11277.
Opinion delivered by Justice
Breedlove. Justices Carlyle and
Goldstein participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** the portions of the trial court's judgment (1) awarding appellee Bank of Utah $520,000 for diminution of the aircraft's value and (2) awarding 18% prejudgment interest on amounts other than past due rent. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with the opinion.

It is **ORDERED** that appellee Bank of Utah recover its costs of this appeal from appellants Megatel C90-2, Inc., Armin Afzalipour, and Megatel Homes, LLC f/k/a Megatel Homes, Inc.

Judgment entered this 7th day of February, 2024.